No. 97-074

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 170

STATE OF MONTANA,

Plaintiff and Respondent,

v.

TIFFANY TYAN BERGER,

Defendant and Appellant.

APPEAL FROM: District Court of the Twenty-First Judicial District,

In and for the County of Ravalli,

The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

John H. Gilliam; Skjelset & Gilliam, P.L.L.P.;

Missoula, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Tammy K. Plubell,

Assistant Attorney General; Helena, Montana

George H. Corn, Ravalli County Attorney; Hamilton, Montana

Submitted on Briefs: March 26, 1998

Decided: July 14, 1998

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1 The defendant, Tiffany Berger, was charged by information filed in the District Court for the Twenty-First Judicial District in Ravalli County with criminal sale of dangerous drugs, a felony, in violation of § 45-9-101, MCA. Following a jury trial, Berger was convicted of the crime with which she was charged; she moved for a new trial; and then later moved to amend her motion based upon newly discovered evidence. The District Court denied Berger's motion to amend her motion for a new**

trial, and denied Berger's motion for a new trial. Berger appeals from the orders and judgment of the District Court. We affirm the District Court.

¶2 The issues on appeal are:

¶3 1. Did the District Court err when it found that there was sufficient evidence to corroborate the accomplice testimony?

¶4 2. Did the District Court err when it allowed the State to introduce evidence of Burger's other acts?

¶5 3. Did the District Court err when it found that the State did not suppress exculpatory evidence?

¶6 4. Did the District Court err when it denied Berger's motion for leave to file an amended motion for a new trial?

## FACTUAL BACKGROUND

¶7 In September 1994, Emily Davenport, a student at Stevensville High School, reported that on September 15, 1994, a fellow student, Russell Moody, approached her and asked her if she was interested in purchasing illegal drugs. Davenport expressed interest and Moody arranged to get drugs for Davenport through Manuel Bean, a student whom he had known for about one year. Bean agreed to obtain any drugs Moody wanted in exchange for $20. Moody gave Bean $20 and Bean agreed to purchase methamphetamine for Moody, which he then intended to sell to Davenport.

¶8 Shortly after Bean's conversation with Moody, Bean went with Jessica Agner to her home. They arrived at Agner's home at approximately 4:00 p.m., at which time, according to Bean, Agner called an unidentified person's pager. The person eventually called back. According to Bean, at some point during the evening, Agner's boyfriend, Chris Joy, came to Agner's house. Bean testified that no one else came to the house that evening with the exception of a locksmith who was there to work on Agner's car. Bean admitted that he received a quarter gram of crystal methamphetamine from Agner in exchange for $25. According to Bean, he received the drugs in Agner's living room sometime between 7:00 and 8:00 that evening. Bean testified that at no point during that evening was the defendant, Tiffany Berger,

present at Agner's house.

¶9 When a law enforcement officer interviewed Bean's mother, Rosa Bean, she explained that she questioned her son about the source of the drugs at issue and he told her that the person who brought the drugs to Agner's house was a "Tiffany" or a "Tina." According to Mrs. Bean, her son explained to her that he, Agner, and the third person exchanged the drugs and money in Agner's bathroom and admitted that he had used some of the drugs while the three of them were in the bathroom. Bean subsequently denied providing his mother with this information. Bean testified that on the day after the drug purchase he took the drugs to school and gave them to Moody.

¶10 At the time the drug transaction occurred, Jessica Agner was sixteen years old, resided with her mother, and was a junior at Stevensville High School. Agner testified that on or about September 19, 1994, Bean came home with her after school. After arriving at her house, Bean told Agner that he wanted to buy some "speed" and asked Agner if she knew anyone who could get it for him. Agner testified that she made some phone calls and eventually called Tiffany Berger's pager number. According to Agner, Berger called back and agreed to supply the "speed" and bring it to Agner's house later that evening.

¶11 In the meantime, Chris Joy, Agner's boyfriend, arrived at Agner's house. According to Joy, when he arrived at Agner's house, Agner and Bean were waiting for Berger to arrive. Agner mentioned to Joy that they were waiting for Berger to bring some kind of drugs. Joy testified that later that evening Berger arrived at Agner's house in a small, maroon, four-door car with a broken windshield, that sounded like it had no muffler. He reported that Berger arrived with two males who were approximately eighteen years old. Joy watched as Berger, Bean, and Agner went into the bathroom, where he estimated they stayed for about twenty minutes. Joy visited with the two males who had arrived with Berger until Berger emerged from the bathroom. According to Joy, Berger and the two males visited for a few minutes and then left. Shortly after Berger's departure, at approximately 11:00 p.m., Joy gave Bean a ride home.

¶12 Agner testified that Berger arrived at her house, after Joy's arrival, at around 10:00 p.m. and was driving a small passenger car with out-of-state license plates and a loud muffler. Agner also testified that Berger was accompanied by two males.

Agner further reported that after she and Berger visited for a few minutes, the two of them, along with Bean, went into the bathroom. While in the bathroom, Agner gave Berger the money, which Bean had provided, in exchange for a plastic ziplock baggie of "speed." According to Agner, all three of them snorted some of the "speed" before leaving the bathroom. Agner estimated that the three of them were in the bathroom for approximately ten minutes before Berger left with the two males.

¶13 At trial, Agner admitted that she had told her mother, Berger's father, Berger's attorney, and the investigating officer that Berger did not supply the drugs and that she did not know where the drugs came from. At the time she made those statements, she was living at Berger's house. Agner testified, however, that Berger did supply the drugs and explained that she had stated otherwise in an attempt to keep Berger out of trouble and to preserve their friendship.

¶14 Berger did not testify at trial, but prior to trial she gave a statement to a detective with the Ravalli County Sheriff's office in which she admitted going to Agner's house on the night in question. Berger explained that Agner called her pager earlier in the evening, and that at about 11:00 p.m., she went to Agner's house with two male friends whom she identified as "Chris" and "Kelly." Berger recalled that Joy and Bean were at Agner's house. She verified that she was in the bathroom with Agner and Bean and that she snorted some methamphetamine with them. Berger offered no explanation for going to Agner's house late in the evening other than to visit Agner. Berger denied selling Agner or Bean drugs.

¶15 Russell Moody acknowledged that he had received a ziplock baggie of drugs from Bean on the day following the drug transaction at Agner's home. After school, Moody called Emily Davenport who instructed him to bring the drugs to her house. Moody took the drugs to Davenport, and she gave Moody $40. Five days later, Davenport orally ingested some of the methamphetamine and became ill. She was transported to the hospital by ambulance where her blood test revealed evidence of methamphetamine.

¶16 On September 28, 1994, a detective with the Ravalli County Sheriff's office began investigating the illegal drug transaction which culminated in Davenport's hospitalization. The investigation began with Davenport who reported that she received the drugs from Moody. From Moody the detective learned that the drugs came from Bean. From Bean, the investigation proceeded to Agner's house. Both

Agner and Joy ultimately reported that Berger supplied the drugs in exchange for money.

¶17 As a result of the investigation, Moody pled guilty to the felony offenses of possession of dangerous drugs, sale of dangerous drugs, and criminal endangerment. Agner pled guilty to the offense of conspiracy to sell dangerous drugs. Berger was charged with the sale of dangerous drugs.

¶18 In late October 1995, Berger's father told her attorney that Robert Rodriguez had called him and vaguely reported having some information about Berger and Agner. Berger's attorney set up an appointment with Rodriguez, which Rodriguez did not attend. On November 7, 1995, Berger's father called her attorney and stated that he had again talked to Rodriguez. Rodriguez had reported to him that he had conversed with Detective Alvin J. Bailey, Jr., and an ATF agent about Berger's case.

¶19 Berger's attorney met with Bailey and the prosecuting attorney on November 8, 1995, approximately one week before Berger's trial. At the meeting Bailey verified that he had contact with Rodriguez, however, he explained that it had nothing to do with Berger's case. After the meeting, Berger's attorney again unsuccessfully attempted to contact Rodriguez.

¶20 At trial, following presentation of the State's evidence, Berger moved the District Court to dismiss the case based on lack of sufficient evidence to corroborate accomplice testimony. The District Court denied this motion and found that Berger's statement to the police and Chris Joy's testimony showed "more than mere suspicion" that Berger did, in fact, commit this crime. Berger was convicted of the crime with which she was charged. Following her conviction, she moved for a new trial.

¶21 Berger's attorney finally met with Rodriguez on December 22, 1995, over one month after Berger's trial. Rodriguez reported that Agner had told him that Berger was innocent and that he had relayed that information to Bailey. He also provided information about other criminal charges pending against Berger in Missoula for crimes which he believed Berger was wrongly accused. Based on this information, Berger's attorney moved to amend her motion for a new trial based on newly discovered evidence.

¶22 The District Court, after listening to testimony from Rodriguez, Bailey, and other law enforcement people who had been involved, and balancing the credibility of Rodriguez against the credibility of the others, stated:

This Court has noted numerous instances in which Mr. Rodriguez has provided testimony contradicted in both significant and insignificant aspects by other independent evidence and by far more credible witnesses. Mr. Rodriguez's own testimony has been internally inconsistent and at variance in key details from that of defense counsel.

The District Court rejected Berger's theory that Bailey was part of a "pattern of deceit" to sidetrack Berger's discovery of the information Rodriguez had to offer. It concluded that if any person had attempted to deceive, it was Rodriguez, and denied Berger's motion to amend.

## ISSUE 1

¶23 Did the District Court err when it found that there was sufficient evidence to corroborate the accomplice testimony?

¶24 After the State presented its evidence, Berger orally moved the District Court for a directed verdict. She claimed that Agner's testimony was the only proof presented by the State, and that because Agner was an accomplice to the crime, the State had to present independent evidence to corroborate Agner's testimony, which it had failed to do. The District Court denied Berger's motion based upon the corroborating effect of Joy's testimony and Berger's own statement.

¶25 We review the denial of a motion for directed verdict in the same manner that we review the sufficiency of evidence to support a conviction. *See State v. Bower* (1992), 254 Mont. 1, 833 P.2d 1106. We examine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Mergenthaler* (1994), 263 Mont. 198, 203 868 P.2d 560, 562. The decision to direct a verdict at the close of the State's case lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *See State v. Moore* (1994), 268 Mont. 20, 64, 885 P.2d 457, 484, *overruled on other grounds by State v. Gollehon* (1995), 274 Mont. 116, 121, 906 P.2d 697, 701.

¶26 Section 46-16-213, MCA, requires that an accomplice's testimony be corroborated "by other evidence that in itself and without the aid of [such] testimony . . . tends to connect the defendant with the commission of the offense." According to Berger, the corroborating evidence provided by the State to support the accomplice testimony of Agner and Bean was insufficient to support Berger's conviction. We disagree.

¶27 Based upon our application of § 46-16-213, MCA, this Court has established certain guidelines for testing the sufficiency of corroborating evidence. We have held:

To be sufficient, corroborating evidence must show more than that a crime was in fact committed or the circumstances of its commission. It must raise more than a suspicion of the defendant's involvement in, or opportunity to commit, the crime charged. But corroborative evidence need not be sufficient, by itself, to support a defendant's conviction or even to make out a Prima facie case against him. Corroborating evidence may be circumstantial and can come from the defendant or his witnesses.

*State v. Kemp* (1979), 182 Mont. 383, 387, 597 P.2d 96, 99 (emphasis added) (citations omitted).

¶28 Corroborating testimony is viewed in a light most favorable to the State. *See State v. Conrad* (1990), 241 Mont. 1, 4-5, 785 P.2d 185, 187. The corroborating evidence need only tend to connect the defendant with the crime charged and need not extend to every fact to which the accomplice testifies. *See State v. Ungaretti* (1989), 239 Mont. 314, 318, 779 P.2d 923, 925. Thus, corroborating evidence is not insufficient merely because it is circumstantial, disputed, or possibly consistent with innocent conduct; it is the jury's duty to resolve such factual questions. *See State v. Kaczmarek* (1990), 243 Mont. 456, 460, 795 P.2d 439, 442. To be sufficient, however, corroborating evidence must show more than an opportunity to commit the crime, or a mere suspicion that the defendant committed the crime. *See State v. Kemp* (1979), 182 Mont. 383, 387, 597 P.2d 96, 99. The evidence must satisfy a three part test: "Corroborative evidence must clearly (1) be independent, (2) point toward the defendant's guilt, and (3) provide a legally sufficient connection between the defendant and the offense." *State v. Paulson* (1991), 250 Mont. 32, 46, 817 P.2d 1137, 1145-46.

¶29 In this case, there was sufficient evidence to corroborate Agner's testimony. The

chain of events that led to Berger's involvement in the drug transaction was clear. Davenport and Moody agreed to complete a drug transaction. Moody then requested Bean's assistance in order to procure the drugs. Bean then approached Agner and asked that she contact a supplier of the drugs. It is clear from Agner and Bean's testimony that they went to Agner's house where Agner left a message on someone's pager. Berger's own statement that she was paged by Agner that evening corroborates Agner and Bean's testimony.

¶30 Had Agner made the drugs available prior to Berger's arrival, there would have been no need for Bean to stay at Agner's house from 4:00 p.m. until 11:00 p.m. If Agner was the actual supplier of the drugs, she and Bean could have completed the drug transaction hours earlier without having to contact or wait for Berger. The fact that Berger did not appear at Agner's house until approximately 10:00 p.m. or later is the most reasonable explanation for Bean's lengthy visit.

¶31 Further, even though Bean denies seeing Berger at Agner's house, Bean's mother testified that Bean told her that a girl by the name of Tiffany or Tina responded to a pager call from Agner and provided them with the drugs. More importantly, Berger herself admitted she was at Agner's house that night. Berger even admitted that she was in the bathroom with Bean and Agner, and recalled that Bean and Agner got into a disagreement about the amount of money to be given in exchange for the drugs. All of this information was further corroborated by Chris Joy, who had no involvement in the drug transaction. The testimony of Agner, Joy, and Berger is all consistent except that Berger denies actually selling the drugs.

¶32 There is no question that the drugs went from Agner's bathroom to Bean, who then delivered them to Moody, who delivered them to Davenport who ingested the drugs and tested positive for having drugs in her system. Joy testified that his understanding of why Bean was at Agner's house was to wait for the arrival of Berger. The testimony clearly indicates that Agner and Bean alone could not have completed the drug transaction, and that Berger was the essential link and source of the drugs. The evidence provided by Joy, Berger, Bean, Moody, Davenport, and Mrs. Bean is corroborative and points toward Berger's guilt.

¶33 The evidence provided by Berger and the other witnesses may not be sufficient, by itself, to support Berger's conviction; however, when viewed in a light most favorable to the State, it clearly connects Berger to the commission of this crime and

raises more than a suspicion of Berger's involvement in the sale of the drugs. Any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

¶34 Accordingly, we conclude that the District Court did not abuse its discretion when it found, at the close of the State's case, evidence that would support Berger's guilt. Therefore, the District Court did not err when it denied Berger's motion for a directed verdict.

ISSUE 2

¶35 Did the District Court err when it allowed the State to introduce evidence of Berger's other acts?

¶36 During cross-examination of Agner, Berger's attorney asked Agner a series of questions that were intended, according to Berger's attorney, to be "questions about prejudice having to do with background, affinity." She was questioned about where she had lived in the past, whether she had lived in Seattle and Missoula prior to the drug transaction at issue, whether she had ever obtained methamphetamine in Washington, whether she had stolen a car, whether there were any pending criminal charges against her, whether she used drugs on the night in question, and whether she had ever been convicted of other crimes. The State, on the other hand, contended that the intent of the questioning was to imply that Agner was the actual source of the drugs and to imply that she is a "sort of skip-around who goes hither and yon and chases drugs," and is "just this little bit of trash that floats around the surface of the drug culture." The State argued that it should be entitled to rebut any inferences that the defense conveyed on cross-examination, and particularly the reason for Agner's frequent moves. According to the State, one of the reasons Agner moved from the Stevensville area was that she had been threatened and severely beaten by Berger sometime after the drug transaction at Agner's house, and was afraid of Berger and her family.

¶37 The District Court concluded that the assault by Berger was not a prior bad act but a subsequent act which was intended to influence a prosecution witness and which could demonstrate Berger's consciousness of her guilt. The District Court allowed the State to question Agner about why she moved and why she was fearful of Berger and her family.

¶38 On appeal, Berger contends that the District Court abused its discretion when it allowed the State to question Agner about her frequent moves, even though Berger introduced the issue on cross-examination. Berger characterizes the response elicited by the State's question on re-direct as improper character evidence in violation of Rule 404(b), M.R.Evid., because it revealed Berger's assault of Agner. Rule 404(b), M.R.Evid., provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶39 We have held that the district court has broad discretion to determine whether evidence is relevant and admissible. *See State v. Oatman* (1996), 275 Mont. 139, 143, 911 P.2d 213, 216. An item of evidence is relevant if it will have any value, as determined by logic and experience, in proving the proposition for which it is offered. *See Oatman*, 275 Mont. at 143-44, 911 P.2d at 216. We review a district court's evidentiary ruling to determine whether the district court has abused its discretion. *See Oatman*, 275 Mont. at 144, 911 P.2d at 216. Even if evidence is improperly admitted, we will not reverse the district court unless the evidence admitted prejudiced the defendant. *See State v. Gray* (1983), 202 Mont. 445, 449, 659 P.2d 255, 257. In order for inadmissible evidence to be prejudicial, there must be a reasonable possibility that the evidence might have contributed to the conviction. *See Gray*, 202 Mont. at 449-50, 659 P.2d at 257.

¶40 We conclude that the District Court did not abuse its discretion when it allowed the State to question Agner during re-direct examination about her reason for moving from Stevensville.

¶41 We recognize the rule that when one party cross-examines a witness regarding an event, the witness may be re-examined for the purpose of elaborating on the event in order to explain the part already in evidence. *See Croft v. Thurston* (1929), 84 Mont. 510, 515, 276 P. 950, 952. In this case, the District Court did not err when it gave the State an opportunity to give a complete impression about why Agner moved from town to town. The jury is entitled to a complete explanation, even if that explanation reflected poorly upon Berger.

¶42 The facts of this case are analogous to the facts of *State v. Crockett* (1966), 148 Mont. 402, 421 P.2d 722. In *Crockett*, the appellant cross-examined a witness about time she spent in jail for a prostitution charge in an attempt to show that police coercion was the reason for her testimony. The district court held that by inquiring on cross-examination about the witness's incarceration, the appellant opened the door for the State to explain her testimony during re-direct examination. *See Crockett*, 148 Mont. at 409, 421 P.2d at 726. During re-direct examination, the witness explained that although her jail sentence had expired, she remained in jail for an additional month for her own protection from the appellant. *See Crockett*, 148 Mont. at 409, 421 P.2d at 726. We held that the re-direct examination addressed evidence elicited on cross-examination, and was, therefore, permissible examination. *See Crockett*, 148 Mont. at 409, 421 P.2d at 726. Similarly, our decision in *State v. Board* (1959), 135 Mont. 139, 145, 337 P.2d 924, 928, reflects the policy that "[a party] may not parry with sharpened blade in cross and expect only a sheathed blade in return." The district court makes the final determination of how much evidence is permissible to explain answers during cross-examination.

¶43 The District Court properly admonished the jury prior to re-direct that Agner's testimony should be received only to help explain her testimony on cross-examination and not to show Berger's character. We conclude that the District Court did not abuse its discretion when it allowed Agner to explain that one of the reasons she moved was because of threats and an assault by Berger.

## ISSUE 3

¶44 Did the District Court err when it found that the State did not suppress exculpatory evidence?

¶45 The standard of review of a district court s findings of fact is whether they are clearly erroneous. *See Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904 (citing *Columbia Grain Int'l v. Cereck* (1993), 258 Mont. 414, 417, 852 P.2d 676, 678). We have adopted a three part test in *Interstate Production Credit Ass'n v. DeSaye* (1991), 250 Mont. 320, 322, 820 P.2d 1285, 1287, to determine whether a district court's findings are clearly erroneous. The test provides that: (1) The Court will determine whether the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, the Court will determine if the trial court has misapprehended the evidence; (3) if the findings are supported by

substantial evidence and that evidence has not been misapprehended, this Court may still find "[a] finding is clearly erroneous when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed." (Citing *United States v. United States Gypsum Co.* (1948), 333 U.S. 364, 68 S. Ct. 525, 92 L. Ed. 746). *See DeSaye*, 250 Mont. at 323, 820 P.2d at 1287; *see also Daines*, 269 Mont. at 325, 888 P.2d at 906.

¶46 Berger claims that the State, through Bailey, suppressed exculpatory evidence by failing to disclose statements made by confidential informant Rodriguez about Agner's admissions relating to Berger's innocence. Berger alleges that she did not more aggressively pursue a pre-trial meeting with Rodriguez because of an unrecorded meeting between her attorney, the prosecuting attorney, and Bailey during which, Berger claims, Bailey intentionally suppressed certain information about a conversation between Rodriguez and Bailey in the Ravalli County Sheriff's office on November 6, 1995, in the presence of ATF agent John Kamora. Berger alleges that during the sheriff's office conversation, Rodriguez specifically informed Bailey that (1) Agner had actually given him a statement that Berger did not sell the drugs to her or Bean, and (2) he did not believe Berger was the kind of person to use or sell drugs, but he did think Agner was likely to use and sell drugs. Bailey denies that Rodriguez made any such statements and Agent Kamora, who was present the entire time Bailey and Rodriguez conversed, cannot recall any such statements. All parties to the meeting, however, acknowledge that Berger's name was mentioned in connection with another drug case pending in Missoula County. Burger contends that her conviction should be overturned because Bailey's and Kamora's responses constitute suppression of exculpatory evidence.

¶47 Rodriguez maintains that he discussed his conversation with Bailey with Kamora on the ride back to Missoula from the Ravalli County Sheriff's office. Kamora testified that no such discussion occurred. Rodriguez further claims to have shared his feelings about the sheriff's office meeting with Officer Ken Poteet and Agent Jeff Groeh. Both denied ever having such a conversation with Rodriguez. Because of previous inconsistencies in Rodriguez's own testimony, the District Court found Bailey, Kamora, Poteet, and Groeh more credible than the testimony provided by Rodriguez and, therefore, concluded that there was no suppression of evidence by the State because there was no proof that material evidence came out in the sheriff's office meeting.

¶48 We have held that an intentional or deliberate suppression of evidence is a per se violation of due process sufficient to reverse or nullify a conviction. *See State v. Patterson* (1983), 203 Mont, 509, 512, 662 P.2d 291, 293. Likewise, even the negligent suppression of evidence could constitute constitutional error. *See State v. Wallace* (1986), 223 Mont. 454, 458, 727 P.2d 520, 523.

¶49 The Supreme Court's decision in *Brady v. Maryland* (1963), 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215, established the constitutional rule that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196, 10 L. Ed. 2d at 218. In order to mandate a reversal of a defendant's conviction, "the *Brady* violation must relate to material information." *Lester Kills on Top v. State* (1995), 273 Mont. 32, 42, 901 P.2d 1368, 1374, *cert. denied*, (1996), 516 U.S. 1177, 116 S. Ct 1273, 134 L. Ed. 2d 220. To satisfy the materiality requirement the defendant must prove "that there is a reasonable probability that had the information been provided, the result would have been different or stated another way, is it a 'verdict worthy of confidence'?" *Kills on Top*, 273 Mont. at 42, 901 P.2d at 1374, (citing *Kyles v. Whitley* (1995), 514 U.S. 419, 434, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490). "A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of trial.'" *Kyles,* 514 U.S. at 434, 115 S. Ct. at 1556, 131 L. Ed. 2d at 506 (quoting *Unites States v. Bagley* (1985), 473 U.S. 667, 678, 105 S. Ct. 3375, 3381, 87 L. Ed. 2d 481, 491).

¶50 Berger has acknowledged that her attorney was aware of the existence and identity of Rodriguez prior to the trial, and further that Rodriguez wished to speak to Berger's attorney because he may have had significant information bearing on her defense. In fact, Berger's attorney had set up an office interview with Rodriguez several days prior to trial that did not occur due to Rodriguez's failure to appear. The District Court found that because Berger was well aware that Rodriguez claimed to have information pertinent to the defense, and because Berger and Rodriguez had repeated contact prior to the date of trial, there was no showing of wrong doing by law enforcement. The District Court further found that there was no substantial credible evidence that would suggest that Bailey, or any other law enforcement officer, engaged in the concealment of Rodriguez from Berger or suppressed potentially exculpatory testimony Rodriguez may have had to offer.

¶51 We conclude that, based on the testimony of Bailey and the other officers, the District Court's finding that the State did not suppress exculpatory evidence is supported by substantial evidence and is not clearly erroneous.

ISSUE 4

¶52 Did the District Court err when it denied Berger's motion for leave to file an amended motion for a new trial?

¶53 The standard of review of a district court order granting or denying a new trial based on newly discovered evidence is abuse of discretion. *See State v. Lewis* (1978), 177 Mont. 474, 483, 582 P.2d 346, 351. In *Lewis*, we held that "the matter of granting or refusing a new trial for newly discovered evidence rests largely in the discretion of the District Court." *Lewis*, 177 Mont. at 483, 582 P.2d at 351 (citing *Butler v. Paradise Valley Irrigation Dist.* (1945), 117 Mont. 563, 160 P.2d 481). "[A]pplications for new trials are not favored when a defendant has had ample opportunity to present his case." *State v. Lamping* (1988), 231 Mont. 288, 290, 752 P.2d 742, 744.

¶54 Berger alleges that she was unable to discover exculpatory evidence because the State affirmatively suppressed it. The District Court held a hearing in order to determine whether this was true. The District Court concluded that "the alleged suppression of facts by Det. Bailey to defense counsel only gains credence if it is possible to conclude that there was something said in the sheriff's office meeting to be suppressed, and the Court cannot find that this is so," and, therefore, denied Berger's late amendment of her motion for a new trial. For the reasons discussed above, we conclude that the District Court's finding regarding the alleged suppression of evidence is not clearly erroneous.

¶55 The District Court also found:

It was also apparent from the evidence that defense counsel was well aware that Mr. Rodri[g]uez claimed to have information pertinent to the defense, that defense counsel possessed a pager number for Mr. Rodri[g]uez, and that Mr. Rodri[g]uez was in contact with defense counsel's office and the Defendant[']s father repeatedly prior to the date of trial.

We conclude that that finding was also supported by substantial evidence and was not

clearly erroneous. Therefore, even if the District Court had allowed Berger to amend her motion, she would not have been entitled to a new trial.

¶56 We have consistently applied the criteria set forth in *State v. Greeno* (1959), 135 Mont. 580, 586, 342 P.2d 1052, 1055, when addressing a motion for a new trial based upon newly discovered evidence. In *Greeno*, we established six criteria which must be met to warrant a new trial based on newly discovered evidence: (1) the evidence must have come to the knowledge of the defendant since the trial; (2) it was not through want of diligence that the evidence was not discovered earlier; (3) the evidence is so material that it would probably produce a different result upon another trial; (4) the evidence is not cumulative merely--that is, does not speak as to facts in relation to which there was evidence at the trial; (5) the motion must be supported by the affidavit of the witnesses whose evidence is alleged to have been newly discovered, or its absence accounted for; and (6) the evidence must not be such as will only tend to impeach the character or credibility of a witness. *See Greeno*, 135 Mont. at 586, 342 P.2d at 1055. The *Greeno* criteria are stated in the conjunctive; thus, each must be established before a defendant is entitled to a new trial on the basis of newly discovered evidence. *See State v. Fina* (1995), 273 Mont. 171, 177, 902 P.2d 30, 34.

¶57 In this case, as noted, there is no reason Rodriguez's testimony could not have been discovered by Berger prior to trial. She was a frequent acquaintance of his and her attorney had been advised of the nature of what he had to say.

¶58 Accordingly, we conclude that even if Berger had been allowed to amend her motion on the basis of newly discovered evidence, she could not have satisfied all six *Greeno* factors. Therefore, the District Court did not abuse its discretion when it denied Berger's motion to amend her motion for a new trial. We affirm the judgment of the District Court.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

No

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART