No. 99-054

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 186

300 Mont. 381

6 P.3d 453

---

STATE OF MONTANA,

Plaintiff and Respondent,

v.

BERNARD THEODORE DUFFY, JR.,

Defendant and Appellant.

---

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Stillwater,

The Honorable Maurice Colberg, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Penelope Strong, Attorney at Law, Livingston, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Tammy K. Plubell,

Assistant Attorney General, Helena, Montana

Robert Eddleman, Stillwater County Attorney, Columbus, Montana

---

Submitted on Briefs: February 3, 2000

Decided: July 18, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

1. ¶By Information filed in the District Court for the Thirteenth Judicial District in Stillwater County, the Defendant, Bernard Theodore Duffy, Jr., was charged with two counts of sexual intercourse without consent and two counts of incest. Following a jury trial he was found guilty of all four counts. Duffy appeals from his convictions. We affirm the judgment of the District Court.

2. ¶The following issues are presented for review:

3. ¶1. Did the District Court err when it denied defense counsel the opportunity to personally review confidential victim records?

4. ¶2. Did a legislative change in the statute of limitations which pertained to the Defendant's alleged offenses violate the ex post facto provisions of the Montana and federal constitutions?

5. ¶3. Did the District Court abuse its discretion when it denied Duffy's motions for mistrial based on prosecutorial misconduct?

6. ¶4. Did the District Court err when it denied Duffy's motions for mistrial based on trial testimony that the Court had previously excluded in its order in limine?

7. ¶5. Did the District Court err when it denied Duffy's motion to dismiss Counts III (sexual intercourse without consent) and IV (incest) based on insufficient evidence?

8. ¶6. Do the minimum prison terms found at §§ 45-5-503(3)(a) and -507(4), MCA, as applied to Duffy, violate his right to equal protection?

## FACTUAL BACKGROUND

1. ¶Duffy and Tina Cook had three children together: David, A.M.D., and Sean. When Duffy and Tina's relationship ended, Duffy married Theresa Fay, Tina's sister. Duffy and Theresa had two children together: M.M.D. and P.J.D. In 1985, Duffy, Theresa, and the five children moved from Idaho to Columbus, Montana.

2. ¶At trial, A.M.D. testified that during an evening between January and May 1996, while Theresa was not present and the other children where sleeping, Duffy asked her to perform oral sex in exchange for candy. A.M.D. was six years old at the time. A.M.D.'s testimony regarding the event was:

A. So they went to bed, and I don't remember how he got on the floor, but he laid on the floor. He was just wearing jeans. He had pulled down his pants and asked me if-if I would

suck on his penis like a popsicle, and I was confused a little bit.

Q. Did you ask him anything at that time?

A. Yes, I asked him if he was drunk because I thought it was a rather odd question, and he said he wasn't. I don't know-I don't remember smelling any alcohol or anything like that. I don't know, but-but before-before he asked me to do that he said that he would give me a candy bar and, okay, you know, and I got down. I do not recall if I touched it with my hands. I know that I did put my mouth around it, but my lips did not touch it.

Q. When you say "it"-

A. His penis. And it must have not been-I'm estimating two to five minutes, the whole incident. I just remember that he zipped up his pants, I believe that I got the candy bar, and I went to sleep.

Q. Now, specifically, do you remember, was his penis in your mouth?

A. Yes. I wasn't touching it with my lips or my tongue or anything though

.

1. ¶When A.M.D. was eight years old, she moved from Duffy's home to her mother's home. She told Tina about the sexual incident with Duffy when she was 12, but refused to report it to the State to protect Duffy. A.M.D. lived with Tina in Colorado and Boston, Massachusetts until she was 14. She then moved back to Montana where she lived with Duffy. By then, Duffy and Theresa were divorced.
2. ¶After Duffy and Theresa divorced, M.M.D. lived with Theresa until they had an argument in 1996. M.M.D. then moved to live with Duffy and his new wife Sherry. After M.M.D. began living with Duffy and Sherry, she testified the following

occurred:

A. Nothing unusual happened right away. It was about a couple days, maybe two weeks. Me and my father were sitting in the living room. And he started talking to me about birth control, and I told him I wasn't on it, I didn't want to be put on it, nothing like that. Well, we got into a conversation about him having problems with my stepmom, Sherry, can't get it up, doesn't want to go to the hospital and get it checked out by a doctor, doesn't want it outside the house.

Q. Okay. So he-do you remember the specific words that he used when he was describing this to you?

A. Not all of them. He wanted me to give him a blow job to make sure that it wasn't him because if it wasn't him, he was going to divorce Sherry because she wasn't doing it or something like that. I'm not positive.

. . . .

Q. What was your response to that request?

A. It was no to begin with, and I started crying. And he had asked me to ask a friend if they would do it, and he offered to pay my friend $50 for it, the same as he would a whore.

M.M.D. testified that she asked a friend to perform oral sex for Duffy, but M.M.D.'s friend refused. M.M.D. testified she then performed oral sex for Duffy, and he gave her $20.

1. ¶Prior to trial Duffy filed a demand for disclosure and sought discovery of the victims' medical, psychiatric, psychological, and counseling reports. The District Court denied the motion and reviewed the reports in camera. After its review, the

court provided Duffy with a redacted copy of one page of the records.

2. ¶Duffy also filed a motion in limine to exclude evidence of alleged wrongful acts, which the District Court granted. The Court excluded evidence that Duffy allegedly had sexual contact with A.M.D. when she was 14 years old by placing his hand on A.M.D.'s leg near her groin.

3. ¶During the trial, however, while the prosecutor was examining M.M.D., she testified that after she told her brother Sean about performing oral sex with Duffy, Sean told A.M.D., who then confessed to M.M.D. that she also had similar experiences with Duffy when she was 6 and 14. M.M.D.'s testimony regarding the discussion was:

A. [Sean] was upset. He wanted to tell my sister [A.M.D.] immediately. I told him, "No, it's not supposed to go anywhere. I'm not supposed to tell anybody. I shouldn't have even told you." After that we went back to the trailer, all four of us, [A.M.D.], Sean, [P.J.D.] and I. We're sitting in there by ourselves. Sean had brought it up and explained it to [A.M.D.] while I was there. My sister got upset and said that, "I have no respect for my father anymore. He did the same thing to me," and that's when I found out about my sister.

Q. Okay. But before that time, you hadn't any idea that he had-there had been any incident with your father with [A.M.D.]?

A. No, I did not.

Q. How did [A.D.M.]-did she go into any detail about what had happened to her?

A. No, she didn't. I was told that he had sexually abused her when she was 6 and 14.

Duffy objected and the District Court struck the answer. Duffy then moved for a mistrial, which the Court denied.

1. ¶Duffy also moved for a mistrial based on three incidents which he characterizes as prosecutorial misconduct. Finally, Duffy moved to dismiss Counts III (sexual intercourse without consent) and IV (incest) based on insufficient evidence. The District Court denied these motions, and Duffy was convicted of all four counts. Additional facts will be discussed as they are relevant to particular issues.

## ISSUE 1

1. ¶Did the District Court err when it denied defense counsel the opportunity to personally review confidential victim records?
2. ¶We review a district court's conclusions of law to determine if they are correct. *In re J.J.G.*, 1998 MT 28, ¶ 20, 287 Mont. 313, ¶ 20, 954 P.2d 1120, ¶ 20. We review evidentiary rulings for an abuse of discretion. *State v. Abe*, 1998 MT 206, ¶ 44, 290 Mont. 393, ¶ 44, 965 P.2d 882, ¶ 44. We review orders granting or denying discovery orders for an abuse of discretion. *Rocky Mountains Enter., Inc. v. Pierce Flooring* (1997), 286 Mont. 282, 298, 951 P.2d 1326, 1336.
3. ¶During discovery, the prosecution has an obligation to disclose "all material or information that tends to mitigate or negate the defendant's guilt as to the offense charged or that would tend to reduce the defendant's potential sentence." Section 46-15-322, MCA. The role of the prosecutor is special-it is not to act as a zealous advocate, rather it is to protect the rights of citizens, including citizens accused of crime. *See* Rule 3.8, Montana Rules of Professional Responsibility. The defendant's right to discover exculpatory evidence is derived from the right to confront witnesses. *State v. Reynolds* (1990), 243 Mont. 1, 7, 792 P.2d 1111, 1115.
4. ¶Equally important to the defendant's right to discover exculpatory evidence is the victim's right to protect his or her confidential relations. *State v. Donnelly* (1990), 244 Mont. 371, 376, 798 P.2d 89, 92. Section 26-1-801, MCA, provides: "[t]here are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be examined as a witness in the cases enumerated in this part." For example, § 26-1-805, MCA, provides a doctor-patient privilege, and § 26-1-807, MCA, provides a psychologist-client privilege.
5. ¶When these competing interests conflict, the district court must balance the defendant's need for exculpatory evidence against the privacy interest of the victim. *Donnelly*, 244 Mont. at 376, 798 P.2d at 92. To balance the relative interests of the defendant and the victim, the district court should review the confidential records in camera. For example, in *Donnelly*, we held:

The District Court reviewed the requested psychological records in camera. After in camera inspection the District Court found that the information was not exculpatory nor necessary for the preparation of a defense. Pursuant to this finding the District Court ruled that the requested information was privileged since the testimonial privileges protecting medical and psychological records outweigh the defendant's limited right to such information. This in camera inspection by the District Court suffices to protect the confrontation rights of the defendant. Due to the privileged status of the medical and psychological records requested by defendant, we hold that defense counsel's right to review the medical and psychological records of the victim in an incest case is outweighed by the child's right to confidentiality under the statutes.

*Donnelly, 244 Mont. at 376-77, 798 P.2d at 92. If confidential information is not exculpatory or necessary for the preparation of the defense, defense counsel's right to review the information is outweighed by the victim's right to confidentiality. State v. Biehle (1992), 251 Mont. 257, 261, 824 P.2d 268, 271.*

1. ¶Duffy contends that Montana's in camera procedure is unfair because, while the prosecutor and the judge are permitted to view the victims confidential records, the defendant's counsel is denied access and review by a judge is no substitute for review by the defendant's advocate. Duffy suggests that we adopt the procedure used in Massachusetts, which permits the defendant's attorney to review the victim's confidential records. In *Commonwealth v. Stockhammer* (Mass. 1991), 570 N.E.2d 992, 1001-02, the Massachusetts Supreme Court held that in camera review of privileged documents by the trial judge confused the roles of trial judge and defense counsel and violated Article 12 of the Massachusetts Declaration of Rights. While we concede that in camera review by the court is not the equivalent of scrutiny by the defendant's attorney, we conclude that it is a reasonable compromise which considers the interests of both the defendant and the victim, and therefore decline to adopt the Massachusetts' approach.

2. ¶To allow defense counsel general access to a victim's confidential records could adversely effect the state's interest in uncovering and treating abuse. *See Pennsylvania v. Ritchie* (1986), 480 U.S. 39, 60, 107 S. Ct. 989, 1003. In *Ritchie*, the Supreme Court stated:

Child abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim. A child's feelings of vulnerability

and guilt and his or her unwillingness to come forward are particularly acute when the abuser is a parent. It therefore is essential that the child have a . . . person to whom he may turn, and to do so with the assurance of confidentiality.

480 U.S. at 60, 107 S. Ct. at 1003. The best way to balance the accused's need for exculpatory evidence against the privacy interest of the victim is to have the district court review the confidential records in camera. *See Donnelly*, 244 Mont. at 376, 798 P.2d at 92.

1. ¶In this case, the District Court reviewed a binder containing seven confidential reports. Many of the documents were handwritten notes from mental health professionals, who were involved in the treatment of A.M.D. and M.M.D. Following its in camera review, the District Court ordered a redacted copy of one page disclosed to defense counsel. We conclude that the District Court did not err when it followed this procedure.

## ISSUE 2

1. ¶Did a legislative change in the statute of limitations which pertained to the Defendant's alleged offenses violate the ex post facto provisions of the Montana and federal constitutions?
2. ¶The District Court's conclusion that § 45-1-205(1)(b), MCA (1989), applied to Duffy's case is a conclusion of law. We review a district court's conclusion of law to determine if it is correct. *In re J.J.G.*, 1998 MT 28, ¶ 20, 287 Mont. 313, ¶ 20, 954 P.2d 1120, ¶ 20.
3. ¶The District Court found that Duffy was alleged to have committed the offense of sexual intercourse without consent and incest against A.M.D. on June 3, 1986. At the time, the applicable statute of limitations was § 45-1-205(1)(b), MCA (1985), which provided:

A prosecution under 45-5-502 through 45-5-505, 45-5-507, or 45-5-625 may be commenced within 5 years after the offense was committed if the victim was less than 16 years old at the time the offense occurred.

In 1989, § 45-1-205(1)(b), MCA, was amended to provide:

A prosecution under 45-5-502 through 45-5-505, 45-5-507, 45-5-625, or 45-5-627 may be commenced within 5 years after *the victim reaches the age of 18* if the victim was less than *18 years old* at the time that the offense occurred.

(Emphasis added.) If the statute of limitations contained in § 45-1-205(1)(b), MCA (1985), was not amended in 1989, it would have barred prosecution of Duffy by June 3, 1991. Duffy was charged with the offenses against A.M.D. on March 11, 1997. On August 1, 1997, Duffy moved to dismiss Counts III and IV. The District Court denied Duffy's motion.

1. ¶Duffy contends that at the time he was charged on March 11, 1997, the 1985 statute of limitation had expired, and that to apply the 1989 statute of limitation is an unlawful application of an ex post facto law. The State responds that the statute of limitation was merely tolled in 1989; that the change was merely procedural; and, therefore does not meet the definition of ex post facto legislation.

2. ¶Article I, section 10, of the United States Constitution prohibits the states from passing ex post facto laws. *California Dept. of Corrections v. Morales* (1995), 514 U.S. 499, 504, 115 S. Ct. 1597, 1601. Article II, section 31, of the Montana Constitution also prohibits the passage of ex post facto laws. *In re the Matter of Young*, 1999 MT 195, ¶ 14, 295 Mont. 394, ¶ 14, 983 P.2d 985, ¶ 14. In *Morales*, the United States Supreme Court stated:

In *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S. Ct. 2715, 2718, 111 L. Ed. 2d 30 (1990), we reaffirmed that the Ex Post Facto Clause incorporated "a term of art with an established meaning at the time of the framing of the Constitution." In accordance with this original understanding, we have held that the Clause is aimed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts."

*Morales, 514 U.S. at 504, 115 S. Ct. at 1601. We use a two-part test to determine whether a statute violates the ban on ex post facto laws: (1) the law must be retrospective, and (2) it must disadvantage the offender affected by it. State v. Leistiko (1992), 256 Mont. 32, 36-37, 844 P.2d 97, 100.*

1. ¶With respect to the first part of the *Leistiko* test, the District Court concluded that,

as applied to Duffy, § 45-1-205(1)(b), MCA [1989], was retrospective because it applied to conduct that occurred before it was enacted. The District Court's conclusion was correct. In *Matter of Young*, ¶ 15, we held that the statute in question was retrospective because it was not in effect at the time the offense was charged.

2. ¶However, the District Court held that Duffy failed to satisfy the second part of the *Leistiko* test because "section 45-1-205(1)(b), MCA (1989), does not increase the punishment from what it might have been in 1986; it merely expands the time in which that punishment might be imposed." This conclusion is also correct. Duffy is not disadvantaged in the constitutional sense by the retroactive application of § 45-1-205(1)(b), MCA (1989), because the statute did not alter the definition of or the punishment for the crimes with which Duffy was charged. The conduct of which he was accused was illegal and punishable both before and after the statute of limitation was extended. In *U.S. v. Marrow* (5th Cir. 1999),177 F.3d 272, 294, the circuit court of appeals reviewed a situation similar to Duffy's and held that applying a revised ten-year statute of limitation for bank fraud prosecution was proper and did not violate the ex post facto clause because the initial five-year statute of limitations had not run when the revised ten-year limitations period was enacted, even though the defendant was not indicted within five years of the relevant conduct.

3. ¶In this case, § 45-1-205, MCA (1985), was amended before the original statute of limitations applicable to Duffy's conduct expired. It was a procedural change which extended the time within which Duffy could be prosecuted without redefining his offense or changing the punishment for that offense. Therefore, the District Court's application of the statute of limitations contained in § 45-1-205(1)(b), MCA (1989), did not violate the ex post facto provisions of the Montana and federal constitutions.

## ISSUE 3

1. ¶Did the District Court abuse its discretion when it denied Duffy's motions for mistrial based on prosecutorial misconduct?

2. ¶We review a district court's ruling on a motion for mistrial to determine whether the court abused its discretion. *State v. Partin* (1997), 287 Mont. 12, 17, 951 P.2d 1002, 1005.

3. ¶ Before there can be an abuse of discretion, the defendant first must show that the prosecutor engaged in misconduct. Prosecutorial misconduct is determined by reference to established norms of professional conduct. *See Everroad v. Indiana* (1991), 571 N.E.2d 1240, 1244. Secondly, the defendant must show that the alleged

prosecutorial misconduct violated his or her substantial rights. *State v. Soraich*, 1999 MT 87, ¶ 20, 294 Mont. 175, ¶ 20, 979 P.2d 206, ¶ 20. We will not presume prejudice from charges of prosecutorial misconduct. *Soraich*, ¶ 20.

4. ¶Duffy alleges three incidents of prosecutorial misconduct. First, Duffy contends that in her initial statement to the prosecutor, A.M.D. said that the assault occurred in Idaho. Duffy suggests that the prosecutor improperly instructed A.M.D. that the assault occurred in Montana thereby avoiding Duffy's challenge to Montana's jurisdiction over the offense. Duffy directs us to the following testimony:

Q. Okay. And on the first statement that you gave to, I believe, a social worker in February of 1997 out in Boston, you told her it happened in Challis, Idaho, didn't you?

A. Yes.

. . . .

Q. And when you discussed it with Mr. Eddleman [the prosecutor], he told you that he thought it was in Montana, didn't he?

A. No, when I spoke to Theresa.

Q. Okay. Do you deny that Mr. Eddleman-that you made such a statement that he told you he thought it was in Montana?

A. No, no, but Theresa had told me. I don't know who told me first. I've spoken to both of them.

Q. Do you have any recollection-you have recollection of talking to Mr. Eddleman, correct?

A. Yes.

Q. Okay. And again, you don't have a recollection of whether or not he told you if it was in Montana?

A. Yeah, he told me it was here.

Q. In fact, he said-he said, "He would figure out where I was living." That's what you told me when I interviewed you and asked you about that didn't you?

A. Yes.

Q. And then did he suggest to you that you talk to your Aunt Theresa Fay?

A. Yes.

Q. Okay. And then you had a conversation with Theresa Fay about where you were living, right?

A. Yes.

Q. And, in fact, she described the trailer that you lived in in Montana to you didn't you [sic]?

A. I-I described it first and she told me that it was in Columbus.

1. ¶The State contends it was proper for the prosecutor to discover where A.M.D. lived at the time of the alleged assault and share independent evidence of that location with her.
2. ¶In its Amended Information, the State alleged that Duffy abused A.M.D. between January and May 1986. The prosecutor had documentary evidence indicating that Duffy, Theresa, and A.M.D. lived in Montana as early as September 9, 1985. Further, A.M.D. testified that after she described the trailer home, Theresa told her the trailer was located in Columbus, Montana. The prosecutor was not prohibited from discovering facts to aid A.M.D.'s recollection of where the incident occurred. We conclude that doing so was not prosecutorial misconduct.
3. ¶Duffy also asserts that the prosecutor committed misconduct when the prosecutor questioned Officer Danny Ames about a telephone call Ames made to Duffy while Duffy was living in Colorado. Duffy points to the following testimony:

Q. What did he [Duffy] tell you in the conversation?

A. We talked about the complaint being filed [against Duffy]. He was aware of the complaint. I advised him that I wanted to get his side of the story on the complaint and that he needed to contact Detective Dugan [a Colorado detective], that I had made arrangements with him.

Q. What did the defendant say he would do?

A. The defendant told me that he would contact Detective Dugan. I gave him his name, his address, his phone numbers, his work hours, and he was going to do that.

Duffy contends that this testimony was a violation of his Fifth Amendment right to remain silent and a violation of the prosecutor's obligation pursuant to the omnibus discovery

order since the prosecutor did not disclose Duffy's conversation with Ames. The State responds that even if the prosecutor engaged in misconduct, Duffy was not prejudiced because nothing further was said about what Duffy did or did not do.

1. ¶After Duffy objected to the above testimony, the District Court instructed the jury to disregard any testimony regarding Ames' conversation with Duffy. The District Court also refused to give the State's flight instruction which was the basis for the line of inquiry. We conclude that Duffy's substantial rights were not violated by the testimony given by Ames.

2. ¶ Duffy claims that the third incident of misconduct occurred when the prosecutor elicited testimony from A.M.D. regarding her desire to see Duffy convicted, and then later reiterated that testimony during his rebuttal argument. Duffy also asserts that the prosecutor improperly argued that the Duffy family had been "ripped apart." The State responds that Duffy opened the door for A.M.D.'s testimony, and that the prosecutor's statements made during rebuttal were not misconduct.

3. ¶During cross examination of A.M.D., defense counsel asked, "[y]ou want to see your dad convicted here, don't you?" A.M.D. responded, "yes." During redirect the following question was asked and the following answer was given:

Q. Finally, Ms. Strong [defense counsel] asked you whether or not you wanted to see your father, here today convicted. Can you give us an explanation why?

. . . .

A. Sure. I don't want it to happen to anybody else, basically, and it's not fair for him to not go away for all this stuff.

During the State's rebuttal argument, the prosecutor made the following remarks:

[I]n answer to their question of why she thought he should be convicted, it wasn't that she wanted revenge, it wasn't that she hated her father now, it was because she couldn't let it happen to somebody else.

Imagine what she had to feel, knowing that because she did not disclose [it] it happened to her sister too. Imagine what it would felt like to know that your sister was abused because you hadn't gone to the authorities, and maybe you can feel some of the pain she felt as she sat at that stand and testified.

1. ¶A district court has broad discretion to determine whether evidence is relevant and admissible. *State v. Berger*, 1998 MT 170, ¶ 39, 290 Mont. 78, ¶ 39, 964 P.2d 725, ¶ 39. Evidence is relevant if it has value, as determined by logic and experience, in proving the proposition for which it is offered. *Berger*, ¶ 39. When one party cross-examines a witness regarding an event, the witness may be re-examined for the purpose of elaborating on the event in order to explain what is already in evidence. *Berger*, ¶41. During closing argument, an attorney may argue and draw reasonable inferences from evidence so long as there are facts to support such statements. *State v. Bashor* (1980), 188 Mont. 397, 417, 614 P.2d 470, 481.

2. ¶In this case, after defense counsel asked A.M.D. if she wanted Duffy convicted, the prosecutor was free to re-examine A.M.D. for the purpose of discovering A.M.D.'s motive. When A.M.D. stated, "I don't want it to happen to anybody else, basically, and it's not fair for him to not go away for all this stuff," she was explaining why she had answered "yes" to defense counsel's question: "[y]ou want to see your dad convicted here, don't you?" The prosecutor's question was proper. Further, it was reasonable to infer that the prosecutor's statements during rebuttal argument were based on A.M.D.'s testimony. Based on the facts in this case, neither was it unreasonable to infer that the family's relations had been severely strained.

3. ¶We conclude that the District Court did not abuse its discretion when it denied Duffy's motions for mistrial based on prosecutorial misconduct.

## ISSUE 4

1. ¶Did the District Court err when it denied Duffy's motion for mistrial based on trial testimony that the court had previously excluded in its order in limine?

2. ¶We review a district court's denial of a motion for mistrial to determine whether the district court abused its discretion. *State v. Partin* (1997), 287 Mont. 12, 17-18, 951 P.2d 1002, 1005. Our analysis takes into consideration whether there is a reasonable possibility that inadmissable evidence contributed to the conviction. *Partin*, 287

Mont. at 18, 951 P.2d at 1006. "In determining whether a prohibited statement contributed to a conviction, the strength of the evidence against the defendant-together with the prejudicial effect of the testimony and whether a cautionary jury instruction could cure any prejudice-must be considered." *Partin*, 287 Mont. at 18, 951 P.2d at 1006.

3. ¶In this case, both of Duffy's daughters, A.M.D. and M.M.D., testified that Duffy sexually abused them. While M.M.D. testified that she discovered that Duffy had sexually abused A.M.D., when A.M.D. was 6 and 14, she did not testify regarding any facts in support of that conclusion. Her testimony was essentially void of context. Additionally, following Duffy's objection, the District Court immediately struck the objectionable part of the testimony. We conclude that M.M.D.'s objectionable testimony was not prejudicial. Therefore, we conclude that the District Court did not err when it denied Duffy's motion for mistrial based on trial testimony that the Court had previously excluded in its order in limine.

## ISSUE 5

1. ¶Did the District Court err when it denied Duffy's motion to dismiss Counts III and IV based on insufficient evidence?

2. ¶We review the sufficiency of the evidence to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Medrano* (1997), 285 Mont. 69, 73, 945 P.2d 937, 939.

3. ¶Both offenses, sexual intercourse without consent, § 45-5-503, MCA, and incest, § 45-5-507, MCA, include the element of sexual intercourse. "'Sexual intercourse' means penetration of the vulva, anus, or mouth of one person by the penis of another person . . . ." Section 45-2-101(67)(a), MCA. Section 45-2-101(67)(b) provides: "[f]or purposes of subsection (67)(a), any penetration, however slight, is sufficient."

4. ¶Duffy contends that since A.M.D. testified that she did not touch Duffy's penis with her lips, tongue, or mouth, there was insufficient evidence to convict him of sexual intercourse without consent and incest. The State responds that although A.M.D. testified that she did not touch Duffy's penis, she also testified that she had Duffy's penis in her mouth, which, the State contends, is sufficient to meet the element of sexual intercourse.

5. ¶When asked, "[n]ow, specifically, do you remember, was his penis in your mouth," A.M.D. responded, "Yes[,] I wasn't touching it with my lips or my tongue or anything though." Touching is not necessary. Penetration of A.M.D.'s mouth,

however slight, by Duffy's penis is sufficient to meet the statutory definition of sexual intercourse. After viewing the evidence in the light most favorable to the prosecution, we conclude that based on A.M.D.'s testimony, a rational trier of fact could have found that Duffy engaged in sexual intercourse with A.M.D. beyond a reasonable doubt. Therefore, we conclude that the District Court did not err when it denied Duffy's motion to dismiss Counts III and IV based on insufficient evidence.

## ISSUE 6

1. ¶ Do the minimum prison terms contained in §§ 45-5-503(3)(a) and -507(4), MCA, as applied to Duffy, violate his right to equal protection?

2. ¶We review constitutional issues to determine whether the court's interpretation of the law is correct. *In re the Matter of S.L.M.* (1997), 287 Mont. 23, 32, 951 P.2d 1365, 1370.

3. ¶Duffy contends that since A.D.M. and M.M.D. were less than 16 years old at the time he sexually abused them, §§ 45-5-503(3)(a) and -507(4), MCA, require a minimum four- year prison term, which deprives him of equal protection because he does not qualify for the exception to the minimum four-year term found at § 46-18-222(5), MCA. Duffy asserts that he is similarly situated to persons convicted of sexual assault, but treated differently because those offenders convicted of sexual assault can qualify for the exception to the minimum sentence contained in § 46-18-222(5), MCA. Duffy asserts that there is no rational basis for such a distinction.

4. ¶Before Duffy can claim standing to complain that he was unconstitutionally affected by the mandatory minimum sentences, he must have been subject to those sentences. He was not sentenced to the mandatory four-year minimum for any of his offenses. He was sentenced to 20 years for each offense of sexual intercourse without consent and 10 years for each incest conviction based on the District Court's independent determination of the magnitude of his offenses. Therefore, we conclude that Duffy has not been affected by the disparate treatment of sex offenders based on the nature of their offense and has no standing to challenge the State's sentencing scheme based on either equal protection or due process.

5. ¶The judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER