No. 04-421

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 343

STATE OF MONTANA,

Plaintiff and Respondent,

v.

PACER FERGUSON,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, Cause No. DC 2003-441
The Honorable Gregory R. Todd, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jack E. Sands, Attorney at Law, Billings, Montana

For Respondent:

Hon. Mike McGrath, Montana Attorney General,
Jennifer Anders, Assistant Attorney General, Helena Montana

Dennis Paxinos, Yellowstone County Attorney,
Mark J. Murphy, Deputy County Attorney, Billings, Montana

Submitted on Briefs: January 11, 2005

Decided: December 28, 2005

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Pacer Anthony Ferguson (Ferguson) appeals from the Judgment of the District Court of the Thirteenth Judicial District, Yellowstone County, sentencing him to prison upon his conviction for the offense of attempted robbery. We affirm in part, reverse in part, and remand for re-sentencing.

¶2    Ferguson raises the following issues:

¶3    1. Did the District Court err in allowing Spaeny to testify?

¶4    2. Did the District Court err in allowing testimony regarding other crimes?

¶5    3. Did the District Court err in denying Ferguson's Motion for a Mistrial based on alleged prosecutorial misconduct?

¶6    4. Did the District Court err in denying Ferguson's motions for a directed verdict of acquittal?

¶7    5. Did the District Court err in sentencing Ferguson?

¶8    6. Did the District Court err in not granting Ferguson's Motion to Dismiss for failure to enter a written judgment on the record within the time period established at § 46-18-116(1), MCA?

¶9    7. Did the proceedings contain cumulative error sufficient to warrant a new trial?

### FACTUAL AND PROCEDURAL BACKGROUND

¶10    At approximately 8:00 p.m., on January 29, 2003, Don Janich (Janich) drove from his home to the Wal-Mart store located on Main Street in Billings. Janich purchased several miscellaneous items, paying in cash. At the time, he was carrying a roll of twenty-dollar

2

bills, amounting to roughly $300, which he displayed when making his purchase. Ferguson was at the same Wal-Mart that night with his girlfriend, Erin Spaeny (Spaeny), and his friends Tyson Heisler (Heisler), Devin Vezina (Vezina), and Tim Taylor (Taylor). They arrived as a group, in Vezina's car.

¶11    Ferguson, Spaeny, Vezina, and Taylor entered the store and saw Janich in the check-out line with his large roll of bills. Janich proceeded to the parking lot and commenced a conversation on his cell phone while sitting in his truck. Shortly thereafter, Ferguson, Vezina, and Taylor approached Janich and asked to use his phone. As he was engaged in a conversation, Janich declined to lend his phone to the strangers. They departed, only to return approximately fifteen minutes later, at which time Janich was still talking on his phone. This time, the group engaged in an attempt to rob Janich.

¶12    Although it is not clear what role each individual played, it is undisputed that someone in the group opened the truck door and pulled on Janich's shoulder in an attempt to remove him from the vehicle. Further, someone demanded Janich's money, and someone displayed a knife. Janich remained in the truck and managed to slam the door shut, clipping one of the perpetrators in the process and causing them to flee. He then pursued the group in his truck until they split up. Shortly thereafter, Janich reported the incident to law enforcement officials.

¶13    On June 20, 2003, the State filed an Information charging Ferguson with attempted robbery. At this time, Ferguson was seventeen years old. The Honorable Gregory R. Todd considered a transfer to Youth Court, but ultimately ordered that the prosecution proceed in

3

District Court. Having pled not guilty and waived his right to a speedy trial, Ferguson went to trial on February 2, 2004.

¶14 At trial, the jury viewed Wal-Mart surveillance video footage which showed rather obscure images moving about the store's parking lot. However, no one denied that the footage showed Ferguson, Taylor, and Vezina approach Janich's truck and then flee through the parking lot. Taylor testified that their request for Janich's phone was just a "setup" for the robbery. Ferguson testified that he did not know of the planned robbery; that he had nothing to do with it; that he merely accompanied Taylor and Vezina for the purpose of borrowing a cell phone; and that he was shocked when he realized a robbery was taking place. Both Taylor and Vezina testified that they planned the robbery together and did not discuss it with Ferguson. Spaeny also testified that to her knowledge Ferguson had nothing to do with the robbery.

¶15 Janich testified that he thought the three perpetrators were working together. He also testified that while only one individual pulled a knife, the other two "acted like they had knives." Finally Janich testified that he did not get a good look at the perpetrators and he could not positively identify any of them in a photo lineup prepared by law enforcement.

¶16 On February 4, 2004, the jury rendered its verdict, finding Ferguson guilty of the offense of attempted robbery. Thereafter, the District Court sentenced Ferguson to a term of fifteen years in the Montana State Prison. Ferguson now appeals, alleging errors in the trial and the sentencing process. Additional facts will be discussed hereinafter as necessary for the resolution of each issue.

## DISCUSSION

¶17 **1. Did the District Court err in allowing Spaeny to testify?**

¶18 Detective Kent Ewalt (Ewalt), of the Billings Police Department, was extensively involved in the investigation of the attempted robbery. As part of that investigation, he interviewed Spaeny at length. Prior to trial, Ferguson moved to bar Spaeny from testifying. The District Court denied the Motion.

¶19 On appeal, Ferguson argues that Spaeny should not have been allowed to testify because she was subjected to "shocking" coercion which made her "an inherently unreliable witness." In advancing this argument, Ferguson relies on *United States v. Vavages* (9th Cir. 1998), 151 F.3d 1185, wherein the Ninth Circuit Court of Appeals reversed a defendant's conviction and remanded for a new trial because the prosecutor intimidated a witness by making "thinly veiled threats to prosecute" her for perjury and to withdraw her plea agreement in an unrelated case if she testified in support of the defendant's alibi defense. The facts of this case, Ferguson argues, provide an even more compelling basis for reversal than did the facts in *Vavages*. Specifically, Ferguson refers us to the following portions of the trial transcript, wherein Ferguson's trial counsel questioned Spaeny regarding her interviews with law enforcement officials:

> Q. Do you remember saying that the officer had told you that if he caught you lying he would stop the tape and immediately arrest you?
> A. Yeah.
> Q. And did you recall Officer Ewalt telling you that--or you saying that he just wanted to arrest me, that's what he said at the house?
> A. Yeah.
> Q. And do you recall saying, I'm about ready to do that, that is to make something up, just so they'll leave me alone and get off my case?

5

A. Yeah.

Q. And you recall being very upset by the way this was going on?

A. Yeah.

Q. Were you frightened of what they were telling you?

A. Yes.

Q. Do you recall Detective Ewalt telling you, I made you a promise. You can be my witness or my defendant and I'll stand by that.

A. Yeah.

Q. And this was after you had denied that Pacer Ferguson was involved in this case, this robbery in any way, shape or form; isn't that true?

A. Yeah.

. . . .

Q. Well, you had told [Ewalt] that Pacer had absolutely nothing to do with this, didn't you?

A. That I could see or that I heard.

Q. And that's true today, isn't it?

A. Yeah.

Q. As far as you know, Pacer had nothing to do with this robbery that you saw or heard; isn't that true?

A. Yes.

. . . .

Q. Officer Ewalt also called you a liar, didn't he?

A. Yes.

Q. Do you recall a deputy prosecutor coming into the room?

A. Yes.

Q. And that was after you had been interrogated for, what, about almost two hours at that time, right?

A. Yes.

Q. And he told you that you have--he said you have trouble remembering, didn't he?

A. Yeah.

Q. And he says that doesn't make things easier. You will be questioned a lot more by me. Didn't he tell you that?

A. Yeah.

. . . .

Q. And then he told you that he would guarantee you that Pacer would hire a lawyer and that they were going to come after you. They will paint you as a liar and call you a liar to your face; isn't that true?

A. Yes.

. . . .

Q. And then he told you that they will have private investigators, totally privately hired who will try to trip you up, embarrass you, make you uncomfortable and do everything short of completely upsetting you.

6

A.   Yes.
Q.   And he told you, this is your chance and you barely passed; is that true?
A.   Yes.
Q.   And he told you, I'm on your side at this time.  If you go on the opposite side, I'm going against you.  That means you will go to the youth detention center and spend the night and a while.  I'm just being honest with you.  Didn't he tell you that?
A.   Yes.
Q.   So he said that if you went on the opposite side, that means testified in support of Pacer, that you would be immediately arrested?
A.   I didn't take it as being immediately arrested, but they would do something to punish me, yeah.
Q.   And that meant going to jail, right?
A.   Yeah.
. . . .
Q.   Didn't he tell you that Pacer is going to paint you as one of the persons involved, didn't he?
A.   Yes.
Q.   And then he told you if you testified for the prosecution you didn't need to worry about being criminally charged, didn't he?
A.   Yes.
Q.   And he said if you did anything wrong, just don't think of them as crimes.  They're not crimes until I charge them as crimes.  Think of them as things that are wrong.  Didn't he tell you that?
A.   Yes.
Q.   After that, you would never meet with a defense attorney alone, would you?
A.   No.
Q.   And you met with prosecutors numerous times?
A.   Yes.

Based upon these portions of the transcript, Ferguson concludes "it is clear that the level of witness coercion present in this case demands a reversal of the conviction."

¶20   Further, Ferguson argues that the effect of the coercion is demonstrated by the fact that Spaeny, despite testifying that Ferguson had nothing to do with the attempted robbery, also testified that when she saw him and the others running from the truck she thought "they had done something wrong and robbed the guy . . . ."  This, inconsistency in her testimony,

7

Ferguson argues, "demonstrates the extent that she went to try and provide useful testimony for the State."

¶21    The State contends that our decision in *State v. Vandersloot*, 2003 MT 179, 316 Mont. 405, 73 P.3d 174, demonstrates that the District Court did not abuse its discretion when it allowed Spaeny to testify. Pursuant to *Vandersloot*, the State argues, whether Spaeny's testimony was motivated by a desire to tell the truth or a fear of prosecution was an issue properly considered by the jury. Further, the State argues that Spaeny's testimony was relevant because she was with Ferguson and the others on the night of the attempted robbery, and her testimony helped piece together other evidence for the jury.

¶22    District courts have broad discretion in determining whether evidence is relevant and admissible, and we will not overturn such a determination unless the court abuses its discretion. *State v. Weldele*, 2003 MT 117, ¶ 41, 315 Mont. 452, ¶ 41, 69 P.3d 1162, ¶ 41 (citing *Somont Oil Co., Inc. v. A & G Drilling*, 2002 MT 141, ¶ 20, 310 Mont. 221, ¶ 20, 49 P.3d 598, ¶ 20). A district court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Weldele*, ¶ 72 (citing *Kiely Const., L.L.C. v. City of Red Lodge,* 2002 MT 241, ¶ 92, 312 Mont. 52, ¶ 92, 57 P.3d 836, ¶ 92). In resolving this issue we need not rely on *Vavages*, as Ferguson suggests, because this Court's precedent provides sufficient guidance. Specifically, we look to *Vandersloot* and *State v. Booke* (1978), 178 Mont. 225, 583 P.2d 405.

8

¶23    The *Booke* decision stemmed from an incident involving the shooting of two victims. *Booke*, 178 Mont. at 227, 583 P.2d at 407. The defendant, Booke, was convicted by a jury verdict on two counts of attempted mitigated deliberate homicide. *Booke*, 178 Mont. at 227, 583 P.2d at 407. During the trial, the district court learned that two witnesses "were being pressured by their father regarding their testimony." *Booke*, 178 Mont. at 232, 583 P.2d at 410. These witnesses informed the district court that they feared "their father's violent temper," but also stated that their previously given statements were truthful. *Booke*, 178 Mont. at 232-33, 583 P.2d at 410. The district court provided the witnesses with a place to stay and the sheriff's protection for the duration of the trial. *Booke*, 178 Mont. at 233, 583 P.2d at 410. On appeal, this Court considered whether the district court should have granted Booke's Motion for a Mistrial based on the intimidation suffered by the two witnesses. *Booke*, 178 Mont. at 232, 583 P.2d at 410.

¶24    This Court's decision was guided by the well-established principle that the jury is the exclusive judge of witness credibility because it is in the best position to make that determination. *Booke*, 178 Mont. at 234, 583 P.2d at 410. In rendering its decision, the Court stated that evidence tending to show that a witness was threatened or induced to testify in a particular manner bears on the credibility of that witness rather than his or her competency to testify. *Booke*, 178 Mont. at 233, 583 P.2d at 410. Additionally, the Court noted that this principle applies in cases where an alleged improper influence comes from law enforcement authorities. *Booke*, 178 Mont. at 233, 583 P.2d at 410 (citing *State v. Geddes* (1899), 22 Mont. 68, 89, 55 P. 919, 926). Stating this principle again in slightly

9

different terms, the Court noted that "[t]raditionally, the testimony of a coerced witness has been admitted on the ground that the coercion goes to the weight and credibility of the testimony, not to its exclusion." *Booke*, 178 Mont. at 233, 583 P.2d at 410 (citing *State v. Braden* (1973), 163 Mont. 124, 128, 515 P.2d 692, 694).

¶25    Finally, the Court observed that defense counsel had examined the witnesses regarding the intimidation, thus providing the jury with an opportunity to weigh the effect of the intimidation and judge the credibility of the witnesses accordingly. *Booke*, 178 Mont. at 233-34, 583 P.2d at 410.  The Court held that the district court properly denied Booke's Motion for a Mistrial. *Booke*, 178 Mont. at 234, 583 P.2d at 410.

¶26    In *Vandersloot*, this Court encountered a somewhat similar challenge to witness testimony.  The defendant, Vandersloot, was charged with criminal sale of dangerous drugs to a fellow inmate while serving time in the Bighorn County Jail. *Vandersloot*, ¶¶ 1, 6. Trent Burke (Burke), who was also serving time in the jail, reported witnessing Vandersloot and another inmate "snorting a powdery substance" in the jail's dayroom. *Vandersloot*, ¶¶ 6, 11.

¶27    Burke had been arrested in Big Horn County and charged with second offense DUI, possession of alcohol in a commercial vehicle, and falsification of commercial records. *Vandersloot*, ¶ 11.  When he did not appear at trial, the court sentenced him *in absentia* to six months in the county jail and imposed a fine. *Vandersloot*, ¶ 11.  Burke was later apprehended in Mineral County and returned to Big Horn County to serve his sentence. *Vandersloot*, ¶ 11.  While serving his sentence, Burke became an inmate trustee.

10

*Vandersloot*, ¶ 12. This status allowed him privileges such as freedom of movement around the facility. *Vandersloot*, ¶ 12. It was during his time as an inmate trustee that Burke allegedly witnessed Vandersloot "snorting a powdery substance." *Vandersloot*, ¶ 12.

¶28 Six weeks after Burke made his report about Vandersloot, the Big Horn County prosecutor deposed Burke to preserve his testimony. *Vandersloot*, ¶ 12. Later that day, Burke appeared before the court and entered guilty pleas on the charges previously brought against him. *Vandersloot*, ¶ 12. The court then re-sentenced Burke, forgiving his fine and cutting over four months from his sentence, such that he was released from jail that same day. *Vandersloot*, ¶ 12.

¶29 Vandersloot made a Motion *in limine* to exclude Burke's testimony at trial. *Vandersloot*, ¶ 7. The district court denied this request and Vandersloot was convicted. *Vandersloot*, ¶ 7. On appeal, we considered whether the district court erred in denying Vandersloot's Motion. *Vandersloot*, ¶¶ 7, 9-18. Vandersloot asserted that "Burke concocted his testimony about inmate drug use in order to gain personal advantage and early release from jail," and that "as a 'convicted liar' Burke was unfit to present his story to the jury." *Vandersloot*, ¶ 10. Pursuant to these assertions, Vandersloot argued that Burke's testimony should have been excluded because its probative value was substantially outweighed by its tendency to mislead the jury. *Vandersloot*, ¶ 10. Vandersloot also argued that "evidence should be excluded from the jury when it appears that the prosecution wrested testimony from a witness in exchange for a 'get out of jail free' card." *Vandersloot*, ¶ 13. He cited no authority for this proposition, but instead relied on *Havens v. State* (1997), 285 Mont. 195,

11

199-201, 945 P.2d 941, 943-44, where we held that the admission of highly prejudicial evidence warranted a new trial on the plaintiff's negligence claim against the State because that evidence was never shown to be relevant during the trial. We determined that Vandersloot's reliance on *Havens* was misplaced, stating "[n]othing in our *Havens* decision indicates that a jury should be shielded from relevant evidence presented by a witness who may be motivated to provide false testimony." *Vandersloot*, ¶ 15.

¶30    We went on to conclude that Burke's eyewitness testimony was "clearly relevant," and stated:

> The exception created by Rule 403, M.R.Evid., for the exclusion of relevant evidence due to its prejudicial or potentially misleading impact on the jury, does not embrace competent eyewitness testimony describing the commission of the offense for which the defendant is on trial.

*Vandersloot*, ¶ 17. We then observed that the district court had invited Vandersloot to thoroughly question Burke regarding his criminal history and whether a link existed between his sentence reduction and his testimony against Vandersloot. *Vandersloot*, ¶ 17. We further observed that Vandersloot took advantage of this opportunity and fully explored Burke's motives for testifying. *Vandersloot*, ¶ 17.

¶31    Finally, reiterating the well-established principle that the weight of the evidence and the credibility of the witnesses are exclusively the province of the trier of fact, we concluded that "Burke's testimony was properly before the jury for the jury to determine witness credibility and the weight of the evidence." *Vandersloot*, ¶ 18 (citing *State v. Flack* (1993), 260 Mont. 181, 189, 860 P.2d 89, 94). Accordingly, we held that the district court did not abuse its discretion by denying Vandersloot's Motion *in limine*. *Vandersloot*, ¶ 18.

12

¶32  As in *Booke* and *Vandersloot*, the witness at issue here was thoroughly examined regarding the alleged coercion.  In denying Ferguson's Motion to bar Spaeny's testimony, the District Court invited defense counsel to undertake this inquiry.  In response to counsel's questions on cross-examination, Spaeny testified that during the course of the interrogation she came to understand that if she testified in support of Pacer "they would do something to punish me . . . ."  She also testified that she became upset and frightened during the process.  In response to the State's questioning, however, Spaeny testified that she did not feel coerced in any way, and that neither law enforcement officers nor anyone from the prosecutor's office had ever told her what to say.

¶33  Additionally, Ferguson's counsel devoted roughly half of his opening statement to the alleged coercion, presenting details regarding Spaeny's interrogation and asserting "the authorities in this case have attempted to intimidate witnesses into saying what they want to say."  Counsel also argued that Ewalt was "obviously telling her what she's supposed to say" and asked "[h]ow can a 14 year old stand up to that kind of pressure?"  Finally, Ferguson's counsel also argued during closing that Spaeny had been subjected to coercion.  Thus, before, during, and after Spaeny's testimony, the jury was presented with evidence and arguments supporting Ferguson's claim of coercion.  We observe that despite Ferguson's claim that Spaeny was coerced into giving inconsistent testimony, she held steadfast, throughout her interrogations and the trial, to her statement that Ferguson had nothing to do with the attempted robbery.

13

¶34 Turning to Ferguson's arguments, we observe that he cites no authority for his premise--the proposition that a district court should exclude the testimony of a witness who may be motived to testify untruthfully because of improper influence by State authorities. This proposition is in direct conflict with our decision in *Booke*, where we stated that evidence tending to show a witness was threatened or induced to testify in a particular manner bears on the credibility of that witness rather than his or her competency to testify. *Booke*, 178 Mont. at 233-34, 583 P.2d at 410. Moreover, the argument Ferguson now presents was rejected in *Vandersloot* based on our longstanding respect for the jury's role in determining witness credibility. *Vandersloot*, ¶¶ 13, 18.

¶35 Indeed, our decisions in both *Vandersloot* and *Booke* were grounded in part on the well-established rule that juries are the exclusive judge of witness credibility. *Vandersloot*, ¶ 18; *Booke*, 178 Mont. at 234, 583 P.2d at 410. To adopt Ferguson's argument would interfere with this jury function by obligating trial judges to assess a witness's credibility pursuant to allegations of improper influence, and by concomitantly allowing judges to pre-empt a jury's determination of the witness's credibility. As we see no reason to alter trial proceedings in this way, we must reject Ferguson's arguments. However, that is not to say that evidence of coercion is irrelevant for all purposes. Indeed, the doctrine of outrageous government conduct may require outright dismissal if government coercion of a witness has the effect of manufacturing evidence. *See State v. Williams-Rusch* (1996), 279 Mont. 437, 444-45, 928 P.2d 169, 173-74 (citing *United States v. Russell* (1973), 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366).

14

¶36 *Booke* clearly indicates that the evidence in question here, regardless of whether it was actually indicative of coercion, did not justify excluding Spaeny's testimony. *See Booke*, 178 Mont. at 233, 583 P.2d at 410. Rather, to the extent that Ferguson's counsel perceived coercion, the evidence in question was proper grounds for questioning Spaeny's credibility on cross-examination. *See Vandersloot,* ¶¶ 17, 18; *Booke*, 178 Mont. at 233-34, 583 P.2d at 410. Thus, we find no fault in the District Court's refusal to bar Spaeny's testimony. That decision allowed the jury to hear relevant testimony and weigh it in light of the evidence which Ferguson perceived as indicative of coercion. This type of evaluation is, of course, one of the primary reasons a jury is convened in the first place. Thus, in light of the well-established rule that it is exclusively the jury's role to judge witness credibility, *Vandersloot*, ¶ 18, *Booke*, 178 Mont. at 233-34, 583 P.2d at 410, the trial judge properly refrained from making that determination himself.

¶37 We have observed that courts, lawyers and lawsuits exist to facilitate the fair search for truth. *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 71, 303 Mont. 274, ¶ 71, 16 P.3d 1002, ¶ 71 (citing *Traxler v. Ford Motor Co.* (Mich. Ct. App. 1998), 576 N.W.2d 398, 405, Gribbs, J., concurring and dissenting). Allowing Spaeny to testify properly facilitated the search for truth in this case because, as the United States Supreme Court has noted, cross-examination is the "greatest legal engine ever invented for the discovery of truth." *Maryland v. Craig* (1990), 497 U.S. 836, 846, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (citing *California v. Green* (1970), 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489). We must note, however, that the search for truth may be substantially hindered by overzealous

15

interrogation tactics, however well-intentioned those efforts may be. Here, Ferguson has presented credible argument that the State's efforts were inappropriate in more than a few instances.[1] However, given the jury's traditional role in determining witness credibility, together with proper respect for the utility of cross-examination, which defense counsel implemented effectively on Ferguson's behalf, we can not conclude that the District Court abused its discretion in allowing Spaeny to testify.

¶38     Our decision here does not address each argument contained in Ferguson's brief. Ferguson argues that Spaeny gave opinion testimony which is not authorized by Rule 701, M.R.Evid, when she testified that she thought "they had done something wrong and robbed the guy . . . ." We will not address this argument because it is raised for the first time on appeal. *State v. Adgerson*, 2003 MT 284, ¶ 12, 318 Mont. 22, ¶ 12, 78 P.3d 850, ¶ 12 (citing *State v. Peterson*, 2002 MT 65, ¶ 24, 309 Mont. 199, ¶ 24, 44 P.3d 499, ¶ 24). It is well established that a party may not raise new arguments or change its legal theory on appeal. *Adgerson*, ¶ 12 (citing *State v. Martinez*, 2003 MT 65, ¶ 17, 314 Mont. 434, ¶ 17, 67 P.3d 207, ¶ 17). Moreover, even if Ferguson had raised this argument below, we could not address it here because he has not provided any supporting analysis as required by Rule 23(a)(4), M.R.App.P. *See Gollehon v. State*, 1999 MT 210, ¶ 10, 296 Mont. 6, ¶ 10, 986 P.2d 395, ¶ 10 (citing *State ex rel. Booth v. Montana Twenty-First Judicial Dist.,* 1998 MT 344, ¶ 35, 292 Mont. 371, ¶ 35, 972 P.2d 325, ¶ 35). As we have held, this Court is not

---

[1]     Particularly, *inter alia*, the prosecutor's unequivocal assertion that defense counsel would attempt to implicate Spaeny in the attempted robbery.

16

obligated to develop legal analysis that may lend support to a litigant's position. *In re Estate of Bayers*, 1999 MT 154, ¶ 19, 295 Mont. 89, ¶ 19, 983 P.2d 339, ¶ 19 (citing *Johansen v. State, Dept. of Natural Resources,* 1998 MT 51, ¶ 24, 288 Mont. 39, ¶ 24, 955 P.2d 653, ¶ 24).

¶39    Additionally, Ferguson purports to raise constitutional issues in his reply brief. He argues that "given the level of coercion, allowing [Spaeny] to testify violated his rights to due process and raised constitutional questions going to the integrity of the judicial process . . . ." Ferguson also argues that we should employ a *de novo* standard of review because he has raised constitutional issues. Pursuant to Rule 23(c), M.R.App.P., we decline to address these arguments because they are raised for the first time in Ferguson's reply brief. *State v. Herbenson*, 2001 MT 75, ¶ 17, 305 Mont. 68, ¶ 17, 22 P.3d 1128, ¶ 17 (citing *State v. Hagen* (1997), 283 Mont. 156, 159, 939 P.2d 994, 996).

¶40    Finally, Ferguson challenges the admission of Spaeny's testimony by directing us to "the authority contained in the defendant's trial brief, supplemental trial brief, and motion to exclude [Spaeny] as a witness . . . ." The Montana Rules of Appellate Procedure do not allow for shortcut tactics such as this. Rule 23(a)(4), M.R.App.P., provides that the argument portion of an appellant's brief "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and pages of the record relied on." The requirements of this rule also apply to respondents, pursuant to Rule 23(b), M.R.App.P.

17

¶41	The requirement that appellate briefs "contain" a party's contentions unquestionably precludes parties from incorporating trial briefs or any other kind of argument into appellate briefs by mere reference. Simply put, appellate arguments must be contained within the appellate brief, not within some other document. The mere reference to arguments and authorities presented in district court proceedings is no substitute for developing and presenting appellate arguments.

¶42	Moreover, Rule 27(d), M.R.App.P., specifies limitations on the number of words and pages contained in appellate briefs. In order to determine whether an appellate brief adheres to these limitations, we examine the content of the brief itself. If parties were allowed to incorporate trial arguments into appellate briefs by reference, Rule 27(d), M.R.App.P., would be seriously undermined. Of course, in those situations where a party needs to incorporate trial arguments into an appellate brief, but lacks the space to do so, that party may request permission to file an over-length brief pursuant to Rule 23(g)(i), M.R.App.P.

¶43	This Court always refers to the district court record to verify the facts of a case and determine whether each party's arguments have been properly preserved for appeal. However, our examination of the district court record is a task distinctly different from our evaluation of appellate arguments. This Court will not refer to documents in the district court record to ascertain the merits of a party's contentions on appeal. Rather, we will rely only upon each party's appellate briefs.

¶44 In conclusion, we hold, based on Ferguson's properly preserved arguments, and pursuant to *Booke* and *Vandersloot*, that the District Court did not abuse its discretion in allowing Spaeny to testify.

¶45 **2. Did the District Court err in allowing testimony regarding other crimes?**

¶46 Rule 404(b), M.R.Evid., provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This Court's precedent supplements Rule 404(b), M.R.Evid., providing both procedural and substantive criteria for the admission of evidence of other crimes, wrongs, or acts. We developed four substantive criteria in *State v. Just* (1979), 184 Mont. 262, 268-69, 602 P.2d 957, 961 (citing *State v. Jensen* (1969), 153 Mont. 233, 239, 455 P.2d 631, 634, *overruled in part on other grounds in State v. Hansen*, 1999 MT 253, ¶¶ 37-39, 296 Mont. 282, ¶¶ 37-39, 989 P.2d 338, ¶¶ 37-39). Subsequently, we modified *Just* in *State v. Matt* (1991), 249 Mont. 136, 142, 814 P.2d 52, 56. Our holding in *Matt*, which incorporates the language of Rules 403 and 404(b), M.R.Evid., is currently referred to as the Modified *Just* Rule, and is to be used in determining admissibility of other crimes, wrongs, or acts. *State v. Ayers*, 2003 MT 114, ¶ 73, 315 Mont. 395, ¶ 73, 68 P.3d 768, ¶ 73 (citing *State v. Aakre*, 2002 MT 101, ¶ 9, 309 Mont. 403, ¶ 9, 46 P.3d 648, ¶ 9).

¶47 The following four criteria make up the Modified *Just* Rule: (1) the other crimes, wrongs, or acts must be similar; (2) the other crimes, wrongs, or acts must not be remote in

time; (3) the evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity with such character; but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; and (4) although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Ayers*, ¶ 73 (citing *Aakre*, ¶ 9). Each of these four criteria must be satisfied before evidence of prior crimes, wrongs, or acts is admissible. *Ayers*, ¶ 76 (citing *Aakre*, ¶ 9; *State v. Freshment*, 2002 MT 61, ¶ 34, 309 Mont. 154, ¶ 34, 43 P.3d 968, ¶ 34).

¶48 Additionally, the following procedural requirements must be observed. *Ayers*, ¶ 77 (citing *State v. Anderson* (1996), 275 Mont. 344, 349-50, 912 P.2d 801, 804). First, evidence of other crimes, wrongs, or acts may not be received unless there has been written notice to the defendant that such evidence is to be introduced. *Ayers*, ¶ 77. The notice to the defendant shall specify the evidence of other crimes, wrongs, or acts to be admitted, and the specific purpose or purposes for which it is to be admitted. *Ayers*, ¶ 77. Second, at the time of the introduction of such evidence, the trial court shall explain to the jury the purpose of such evidence and shall admonish the jury to weigh the evidence only for such purposes. *Ayers*, ¶ 77. Third, in its final charge, the court shall instruct the jury in unequivocal terms that such evidence was received only for the limited purposes earlier stated and that the defendant is not being tried and may not be convicted for any offense except that charged,

20

warning them that to convict for other offenses may result in unjust double punishment. *Ayers*, ¶ 77.

¶49    Several days before trial, Ferguson submitted a brief arguing that the State should not be allowed to present any evidence at trial regarding other crimes, wrongs or acts because it had not given notice of any intent to do so. Specifically, Ferguson requested that the State be precluded from referring to evidence that Ferguson and his companions were in Wal-Mart on the evening in question to purchase gloves for use in future burglaries. Although it referred to Rule 404(b), M.R.Evid., the brief did not include any legal authority requiring notice.

¶50    Prior to Ferguson's trial, the State did not provide notice of intent to introduce evidence of other crimes, wrongs or acts. However, on the first day of trial, the State submitted a brief on this subject. In this brief, the State asserted that over a period of roughly thirty days in early 2003, Ferguson, Taylor, Vezina and Heisler "committed, alone or in concert with each other, over twenty crimes" which were inextricably linked with the charged offenses. Based on the allegedly inseparable nature of all these alleged crimes, the State suggested that the prosecutor was not bound by the procedural rules for introduction of evidence of other crimes, citing *State v. Romero* (1986), 224 Mont. 431, 730 P.2d 1157, and *State v. Ungaretti* (1989), 239 Mont. 314, 779 P.2d 923. Nonetheless, the State asserted that it had "instructed its witnesses not to volunteer testimony about the other crimes committed by this group." The State also predicted that defense counsel would likely open the door to evidence of other crimes with "almost any routine type of cross-examination,"

21

asserting "this pattern of criminal activity makes the introduction of other crimes evidence almost inevitable."

¶51 Prior to jury selection, Ferguson, his trial counsel, and two attorneys for the State met with the trial judge in chambers. During the discussion, the trial judge stated:

> We've had some mention of some 404(b) potential problems. I'm not sure what you folks want me to do on that. I think all I can do now, based on what I've read, is wait to see what is said, how far beyond the scope of this alleged incident, we have the testimony, and then rule at that time. And I guess, State, you run a potential risk of having things excluded in that. But I'm--you know, I haven't--you know, I haven't received a Just notice, but I also haven't received much specifics to say how far afield the State may be going on what they're introducing.

Ferguson's counsel then stated that Taylor, Vezina , and Heisler all claimed to have "received threats that if they testify for Pacer their plea agreements will be taken away or letters will be put in their records when they go to prison by the county attorney's office." Counsel concluded, "[s]o those matters will be raised on cross or direct examination." No further discussion was had on this subject.

¶52 During trial, the State elicited testimony regarding Ferguson's other crimes--offenses which Ferguson allegedly committed, but which were not charged in the proceeding *sub judice*. The State also elicited testimony regarding crimes committed by Heisler, Vezina, and Taylor.

¶53 During the State's re-direct examination of Spaeny, the following colloquy occurred:

> Q. . . . [D]o you remember when defense counsel, Mr. Sands, asked you if you had given four or five statements in this case?
> A. Yes.

22

Q.      In fact, how many statements did you give concerning the Wal-Mart incident?
A.      Two.
Q.      And what were those other statements, the other statements that Mr. Sands spoke of, what were those statements about?
A.      Other crimes that have occurred.
Q.      Okay, specifically, I'll draw your attention to February 6th. Do you remember that interview?
A.      Yeah.
Q.      You met with Detective Ewalt?
A.      Yes.
Q.      Do you remember the substance of that interview?
A.      It was about a car being stolen and some purses that had been stolen.
Q.      And during that interview, who did you discuss had been involved in those crimes?

At this point, Ferguson's counsel objected that the inquiry was irrelevant. The trial judge

overruled the objection, and the prosecutor continued:

Q.      You can answer the question.
A.      Okay. Pacer and Tyson, Tim and Devin.
Q.      Had you been with the defendant on the times that these incidents had occurred?
A.      Not the car being stolen, no, but the other ones, yes.
Q.      And, well, then, during your questioning on the car being stolen--well, I guess I should ask it this way. When you were discussing the car being stolen, can you tell me what kind of car that was?
A.      It was a white Subaru Legacy.
Q.      And do you remember who used to drive that car?
A.      Yes.
Q.      And who was that?
A.      Pacer.

The prosecutor then proceeded to question Spaeny about her prior statements regarding

"garage robberies and purses being stolen." Ferguson's counsel asserted that the inquiry was

irrelevant and beyond the scope of cross-examination. The trial judge sustained this

objections and the prosecutor moved on to another subject.

23

¶54    Subsequently, the prosecutor elicited similar testimony from Heisler while questioning him on cross-examination about the attempted robbery. The following colloquy occurred:

Q.    You were never charged with this particular offense?
A.    I wasn't.
Q.    But you were charged with another robbery, weren't you?
A.    I was.

At this point, Ferguson's counsel stated "I'm going to object. That's irrelevant, that's beyond the scope of direct examination, and it's not a proper question." The trial judge responded "[w]ell, based on those objections, I'll overrule it." The prosecutor then continued:

Q.    You learned a fair amount from the first robbery when you committed the second robbery, didn't you?
A.    I didn't commit a second robbery.
Q.    What did you plead guilty to?
A.    Robbery by accountability and burglary.
Q.    Okay. But the robbery by accountability, how many people were involved in that?
A.    Three.
Q.    And was it--did you try going up against an automobile again that can flee and get away?

At this point, Ferguson's counsel asserted a "continuing objection to this line of inquiry."

The trial judge noted the objection and allowed the prosecutor to continue:

Q.    Was the robbery against a vehicle?
A.    No.
Q.    And what was the weapon used?
A.    A pistol.

The prosecutor then proceeded to another subject and ended the cross-examination shortly thereafter.

24

¶55 When Ferguson took the witness stand, he testified that he was shocked and surprised when he realized that a robbery was taking place. Ferguson further testified regarding his reaction, stating "I was thinking [Vezina was] doing something stupid." On cross-examination, the prosecutor pressed Ferguson regarding these comments:

Q. . . . [H]ow long have you known [Vezina]?
A. Maybe three months.
Q. And this is the first time you've ever seen him do something stupid? And before this, he's been a perfectly upright and upstanding citizen?
A. I never said that.

Ferguson's counsel then objected that the question was irrelevant and beyond the scope of direct examination. The trial judge sustained this objection, and the prosecutor immediately asked "[d]id you ever watch him commit crimes before?" Ferguson's counsel asserted the same objection, and the trial judge again sustained it. The prosecutor then continued:

Q. Earlier in your direct testimony, you said you were surprised and shocked at his behavior. Did you say that? Do you remember that?
A. Yes.
Q. Why?
A. Because I was surprised and shocked.
Q. So it had never happened before?
A. No.
Q. You had never watched something that you thought [sic] him doing something stupid and criminal?

At this point, Ferguson's counsel raised the same objection. This time, however, the trial judge overruled the objection and made a brief comment which seems to suggest that the prosecutor's question was allowed for the purpose of impeachment. The prosecutor then continued:

Q. You had never observed him committing any crimes before?

25

A. Not of this nature, no.
Q. Of any nature.
A. Yes.
Q. You had observed him doing it before?

At this point, Ferguson's counsel asserted that the question had been asked and answered, and the trial judge sustained the objection. Shortly thereafter, the prosecutor concluded the cross-examination.

¶56 Prior to sentencing, Ferguson moved for a new trial, arguing that Rule 404(b), M.R.Evid., had been violated during the trial proceedings. In supporting this argument, Ferguson pointed solely to the State's inquiry into Heisler's convictions, claiming that the elicited testimony was unfairly prejudicial. In denying Ferguson's Motion, the District Court ruled that in light of Heisler's testimony that he knew nothing about the robbery despite his role as the driver of the car, "Heisler's familiarity with robbery was proper impeachment."

¶57 On appeal, Ferguson focuses on each portion of testimony identified above. He contends that this testimony was improperly admitted because it did not meet the procedural or substantive requirements for admission, because it "directly implicated Ferguson," and because it "allowed the jury to conclude that Ferguson was involved in other crimes and associating with bad and dangerous people and unfairly prejudiced his case." In support of this argument, Ferguson reminds us that we have stated, regarding Rule 404(b), M.R.Evid., that "whether or not prior bad acts make the charged conduct more likely, the probative value of admitting the evidence is generally outweighed by the prejudicial effect." *State v. Thompson*, 2001 MT 119, ¶ 25, 305 Mont. 342, ¶ 25, 28 P.3d 1068, ¶ 25.

¶58 The State provides little explanation for the prosecutor's repeated elicitation of testimony regarding other crimes. Rather than justifying this highly questionable conduct, the State contends that Ferguson failed to preserve his current arguments for appeal. In support of this contention, the State asserts that because Ferguson did not cite Rule 404(b), M.R.Evid., as the basis for his objections at trial, the District Court was not presented with an opportunity to consider whether the testimony now at issue was permissible under that evidentiary rule. Further, the State refers us to the well-established rule that a party may not raise new arguments or change its legal theory on appeal. *State v. McCaslin*, 2004 MT 212, ¶ 49, 322 Mont. 350, ¶ 49, 96 P.3d 722, ¶ 49 (citing *Martinez*, ¶ 17).

¶59 We encountered a similar scenario in *State v. Vukasin*, 2003 MT 230, 317 Mont. 204, 75 P.3d 1284. The defendant, Vukasin, spent the evening in question at a bar. *Vukasin*, ¶ 6. His girlfriend, Angela Zigan (Zigan), with whom he shared an apartment, went to the bar and asked Vukasin not to come home that night because he had been drinking. *Vukasin*, ¶ 6. Later that night, when Zigan observed Vukasin drive up to the apartment building, she anticipated a confrontation based on his past behavior. *Vukasin*, ¶ 7. Thus, Zigan took her dog and went across the hall to her neighbor's apartment, where she locked herself in the bathroom. *Vukasin*, ¶¶ 7, 8. Vukasin then "went into a rage"--he commenced screaming, destroying property inside their apartment, and he loudly threatened to kill Zigan. *Vukasin*, ¶¶ 9, 21. Zigan called 9-1-1 and reported that Vukasin was "trashing" their apartment. *Vukasin*, ¶ 9. When law enforcement officers arrived, they heard "loud yelling and banging" coming from the apartment. *Vukasin*, ¶ 10. The officers then knocked on the closed door

and identified themselves. *Vukasin*, ¶ 10. In response, Vukasin repeatedly thrust a knife through the door, revealing four to five inches of the blade on the outside of the door. *Vukasin*, ¶ 10. The officers evacuated the apartment building and arrested Vukasin the next morning. *Vukasin*, ¶ 11.

¶60 The State brought several charges against Vukasin. *Vukasin*, ¶ 12. Prior to his trial, Vukasin filed a Motion *in limine* requesting that there be "no reference, comment, allusion or statement made to any crime, wrong or act pursuant to M.R.Evid. Rule 404(b) other than those related to the charges against the Defendant at trial." *Vukasin*, ¶ 24. The State did not object to the Motion, and it was granted by the district court. *Vukasin*, ¶ 24. At trial, the State elicited testimony regarding Vukasin's past violent behavior. *Vukasin*, ¶ 25. First, Zigan testified that she sought refuge in her neighbor's apartment because Vukasin had previously become violent when drinking. *Vukasin*, ¶¶ 7, 25. Second, one of the responding officers testified that Zigan told him that "there was a history of abuse, that he'd hit her before, and that she was afraid of what was going to happen tonight. So she had run from apartment number three into apartment number four." *Vukasin*, ¶ 25. Vukasin did not object to these portions of testimony at trial. *Vukasin*, ¶ 27. After deliberations, the jury found Vukasin, guilty of two counts of felony assault, one count of disorderly conduct, one count of criminal mischief, and one count of partner or family member assault. *Vukasin*, ¶ 14.

¶61 On appeal, Vukasin argued that the testimony noted above was "prior bad act" evidence which was inadmissible under Rule 404(b), M.R.Evid. *Vukasin*, ¶ 26. He further argued that this evidence was irrelevant to the charges against him and was admitted in

violation of the Pre-trial Order. *Vukasin*, ¶ 26. Finally, he argued that the introduction of this evidence allowed the jury to focus on his character instead of his conduct, and that it prevented him from receiving a fair trial. *Vukasin*, ¶¶ 24, 26.

¶62 We declined to address the merits of Vukasin's arguments. *Vukasin*, ¶ 38. However, we did observe that Vukasin's Motion could have been interpreted as implying that prior to trial he had no objection to the testimony he later challenged--i.e., the Motion sought to exclude evidence of crimes, wrongs, or acts "other than those related to the charges against the Defendant," and Zigan's motivation for fleeing from the apartment may have indeed been related to the charges against Vukasin. *Vukasin*, ¶ 36.

¶63 In rendering our decision, we acknowledged that a motion *in limine* can preserve an objection for appeal, provided that the objecting party makes the basis for the objection clear to the district court. *Vukasin*, ¶ 29 (quoting *State v. Fuhrmann* (1996), 278 Mont. 396, 403, 925 P.2d 1162, 1166, *overruled in part on other grounds in State v. Van Kirk*, 2001 MT 184, ¶ 43, 306 Mont. 215, ¶ 43, 32 P.3d 735, ¶ 43). We further stated that "[s]pecific objections must be made to portions of testimony deemed inappropriate; broad general objections do not suffice." *Vukasin*, ¶ 38 (quoting *State v. Weeks* (1995), 270 Mont. 63, 85, 891 P.2d 477, 490).

¶64 Finally, we observed that because Vukasin's Motion *in limine* was general in nature, and because he did not object at trial to the questionable testimony, the district court was not presented with an opportunity to rule on the admissibility of the evidence which Vukasin later challenged on appeal. *Vukasin*, ¶ 37. Thus, in accordance with the well-established

29

principle that we do not hold a district court in error when it has not been given the opportunity to rule on the admissibility of evidence and correct itself, we declined to address the merits of Vukasin's arguments, concluding that "Vukasin's motion *in limine* was a generalized objection which did not preserve the evidentiary issue on appeal." *Vukasin*, ¶¶ 29, 38 (citing *State v. Stuit* (1996), 277 Mont. 227, 230, 921 P.2d 866, 868).

¶65    *Vukasin* is controlling here. "We have consistently stated that a district court has broad discretion when determining whether other crimes evidence is admissible under Rule 404(b), M.R.Evid." *Ayers*, ¶ 72 (citing *State v. Whitlow* (1997), 285 Mont. 430, 437, 949 P.2d 239, 244). We review the admission of such evidence to determine whether the district court abused its discretion. *Ayers*, ¶ 25 (citing *Aakre*, ¶ 8). However, as we indicated in *Vukasin*, we will not conduct such review where the district court has not been presented with an opportunity to rule on the issue. *Vukasin*, ¶¶ 37, 38 (citing *Stuit*, 277 Mont. at 230, 921 P.2d at 868; *Weeks*, 270 Mont. at 85, 891 P.2d at 490). Here, we decline to address the merits of Ferguson's arguments on appeal because those arguments were not raised at any time in the proceeding *sub judice*.

¶66    In *Vukasin* we determined that the defendant's Motion *in limine*, which sought to exclude evidence of "any crime, wrong or act . . . other than those related to the charges," was a "generalized objection" which was insufficient to preserve his arguments raised on appeal. *Vukasin*, ¶ 38 (citing *Weeks*, 270 Mont. at 85, 891 P.2d at 490). Similarly here, Ferguson's pre-trial objection to the introduction of any evidence of other crimes, wrongs, or acts, was a "generalized objection." In fact, it was so vague that the trial judge concluded

30

he could not rule on it immediately before trial, stating "I'm not sure what you folks want me to do on that. I think all I can do now, based on what I've read, is wait to see what is said . . . and then rule at that time." Moreover, while Ferguson's argument cited Rule 404(b), M.R.Evid., it did not refer to the testimony he now challenges on appeal. The only specific evidence Ferguson referred to is not at issue here. As we have stated, specific objections must be made to portions of testimony deemed inappropriate; broad general objections do not suffice. *Vukasin*, ¶ 38 (citing *Weeks*, 270 Mont. at 85, 891 P.2d at 490). Accordingly, we hold that Ferguson's pre-trial objection was not sufficient to preserve his current arguments for appeal.

¶67 Further, we hold that Ferguson's objections at trial were not sufficient to preserve his current arguments for appeal. In keeping with this Court's precedent, the trial judge's comments in chambers clearly indicated that Ferguson would have to address specific portions of testimony with specific arguments in order to obtain an exclusionary ruling. However, as demonstrated by the portions of testimony listed above, Ferguson did not present Rule 404(b), M.R.Evid., as a basis for excluding the testimony he now challenges on appeal. The District Court simply was not directed to the issues now before this Court. As such, Ferguson's current arguments are presented for the first time on appeal. It is well established that this Court will not address an issue raised for the first time on appeal or a party's change in legal theory. *State v. Weaselboy*, 1999 MT 274, ¶ 16, 296 Mont. 503, ¶ 16, 989 P.2d 836, ¶ 16 (quoting *Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289

Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15). Thus, we must conclude that Ferguson waived his opportunity to make the arguments he now presents on appeal.

¶68 Finally, we note that Ferguson's reply brief raises several new arguments supporting reversal--arguments which were not made in his initial brief and are not responsive to the State's brief. As we have held, pursuant to Rule 23(c), M.R.App.P., we do not address issues raised for the first time in a reply brief. *Herbenson*, ¶ 17 (citing *Hagen*, 283 Mont. at 159, 939 P.2d at 996).

¶69 **3. Did the District Court err in denying Ferguson's Motion for a Mistrial based on alleged prosecutorial misconduct?**

¶70 Taylor was interviewed by Ewalt and another law enforcement officer in February of 2003, regarding the attempted robbery. Ewalt and the prosecutor interviewed Taylor again on the Thursday before trial. During the February interview, which was recorded on video tape, Taylor summed up the incident by saying that he, Vezina, and Ferguson "tried to rob somebody at Wal-Mart." Providing further details, Taylor stated:

> Pacer decided to go. So it was me, Pacer and Devin. . . . We went up to him and we pulled a knife on him. . . . Devin opened the truck, and we tried to pull the guy out, but he wouldn't come out. And so Pacer pulled a knife and, I don't know, the guy kind of flipped out, and started driving this way, and then he tried to--he tried to run us over.

¶71 Taylor's testimony at trial was not consistent with his statements made during the interview in February. Taylor testified that he and Vezina planned the robbery and that they did not discuss the plan with Ferguson, but merely asked him to walk along with them to ostensibly borrow a cell phone. Taylor also testified that after their plan failed, Ferguson

32

"was pretty angry that we didn't let him know." Further, Taylor testified that Ferguson did not have the knife during the incident. Finally, Taylor testified that he was under the influence of drugs during his February interview with Ewalt, and that he had not spoken truthfully at that time.

¶72    The record before us does not reveal whether Taylor's trial testimony was consistent with the statements he gave to Ewalt and the prosecutor on the Thursday before trial. However, the prosecutor pressed Taylor with questions which suggested that his statements given on Thursday were not consistent with his trial testimony, but were similar to the first statements given to Ewalt in February. The jury heard, *inter alia*, the following:

> Q.    Do you remember giving an interview to Detective Ewalt on the 6th of February?
> A.    Vaguely, yeah.
> Q.    Do you remember discussing this particular night at Wal-Mart?
> A.    A little bit, yeah.
> Q.    Do you remember what you said?
> A.    Not really.
> Q.    Did you tell Detective Ewalt the truth that night?
> A.    No. I was under the influence of drugs.
> Q.    When you were interviewed?
> A.    Yes.
> Q.    And did I meet with you last week, on Thursday?
> A.    Yes.
> Q.    And was that at the Yellowstone County Detention Facility?
> A.    Yes.
> Q.    And was your attorney present during that interview?
> A.    Yes.
> Q.    And did we discuss this particular incident?
> A.    Yes.
> Q.    Were you under the influence of drugs at that time?
> A.    No.
> Q.    Did you tell me what happened during that interview?
> A.    Yeah, I think so.
> . . . .

Q. And during that interview, did you inform me that there was substantially more involvement by Pacer than what you're telling us today?

A. No.

. . . .

Q. When you talked to Detective Ewalt on February--in February, you started the statement by saying we tried to do a robbery at Wal-Mart and it didn't go too good. Do you remember saying that?

A. Yeah.

Q. Did you provide him substantial details about how the robbery occurred during that interview?

A. Yeah, I think so.

Q. But you were under the influence of some kind of drugs at that point?

A. I had been up three days on methamphetamines and I was smoking marijuana.

Q. Had you been up three days on methamphetamines when you talked to me in the jail when Detective Ewalt and your counsel was there?

A. No.

Q. Did you try and provide substantial details at that time?

A. Yeah, I told you guys that Devin had the knife and that Pacer didn't know about it. And then I was told I needed to go with what I said in the first statement.

Q. And in the first statement to Detective Ewalt, you said that Pacer had the knife, right?

A. Yes.

Q. And you're now retracting that statement?

A. Yes.

¶73 Immediately following Taylor's testimony, the District Court asked the prosecutor whether the State would be calling any other witnesses for examination. The following colloquy occurred:

Mr. Murphy: Your Honor, the State would request that we break for lunch at this point, and we have an opportunity to get Detective Ewalt back for some rebuttal testimony.

The Court: Well, why isn't he here?

Mr. Murphy: Your Honor, the State was obviously unprepared for Mr. Taylor's statement. We met with him on Thursday of last week, and it was substantially different than what we heard today

34

The Court:    Well, we are wasting a considerable amount of the jury's time. It does not make me happy, and I'm sure it does not make them happy.

Mr. Murphy:    He is on duty today, Your Honor, and I will get him as quickly as possible.

The Court:    We'll start again at 1:00. If he's not here, he'll be excluded.

The District Court then called an early lunch recess. During this recess, the attorneys and the trial judge met in chambers. There, Ferguson's counsel moved for a mistrial based on the prosecutor's remark, made in front of the jury, that Taylor's prior statements at the interview on Thursday were "substantially different than what we heard today." Defense counsel argued that the prosecutor had improperly "vouched" for Taylor and improperly "testified" as to what Taylor said before trial.

¶74    In response, the prosecutor stated that when he and Ewalt had interviewed Taylor on the Thursday before trial, Taylor gave no indication he would recant his statements made during the previous interview with Ewalt. Hence, the prosecutor argued he "had no pre-warning that the testimony was going to be like that." Further, the prosecutor argued:

> [A]ll the State was doing, as it did during the testimony, is lay the foundation for prior inconsistent statement. . . . At one point he explained that he was under the influence of substantial amounts of drugs, and at the other time he contested that he ever said anything along the line that I think Detective Ewalt will say he actually provided substantial amounts of detail during our interview.

¶75    The District Court denied Ferguson's Motion. Subsequently, Ewalt took the witness stand for the second time. He identified the video tape which contained a recording of his interview of Taylor in February of 2003. The prosecutor then played the tape for the jury. Ewalt said nothing about Taylor's statements given during the Thursday interview.

35

¶76 On appeal, Ferguson argues that the prosecutor committed misconduct warranting a mistrial when he stated, before the jury, that Taylor's statements given on the Thursday before trial were "substantially different" than his trial testimony. In making this remark, Ferguson asserts, the prosecutor "provided personal testimony before the jury that attacked the credibility of an important witness." Thus, Ferguson argues that the prosecutor violated Rule 3.4(e) of the Montana Rules of Professional Conduct, which provides, *inter alia*, that lawyers shall not assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the credibility of a witness.

¶77 Ferguson also argues that the prosecutor's remark was prejudicial because: (1) it was never supported with evidence and, thus, it was the only indication that Taylor had given an inconsistent statement in his interview on Thursday; (2) it was essentially a statement that Taylor was lying about Ferguson's role in the offense; (3) it was emphasized by the fact that it prompted the District Court to call an early recess allowing the State time to bring in Ewalt to testify; and (4) it "was the only evidence in the trial of any substance indicating that Ferguson knowingly participated in the attempted robbery."

¶78 Finally, it appears that Ferguson seeks to advance an argument he made below--the contention that the prosecutor improperly vouched for Taylor. Ferguson quotes several paragraphs from *United States v. Edwards* (9th Cir. 1998), 154 F.3d 915, 921-22, wherein the Ninth Circuit Court of Appeals explained why a prosecutor should not vouch for a witness. Ferguson also asserts that *Edwards* "speaks specifically to the issue presented here." However, Ferguson provides no analysis as to how the prosecutor's remark in this

case may constitute vouching. Hence, we decline to consider the issue further. *See* Rule 23(a)(4), M.R.App.P.; *Gollehon*, ¶ 10 (citing *State ex rel. Booth*, ¶ 35). As we have held, this Court is not obligated to develop legal analysis that may lend support to a litigant's position. *Bayers*, ¶ 19 (citing *Johansen*, ¶ 24).

¶79 The State argues that the prosecutor's remark was not aimed at the jury and did not express a personal opinion about Taylor's credibility. Rather, the State argues, the remark in question "only confirmed what should have already been apparent to the jury"--that "Taylor was not a cooperative witness, and the State needed to clear up any confusion with additional evidence." As such, the State contends, the prosecutor's remark did not violate Rule 3.4(e). Further, the State notes that despite the limitations imposed by Rule 3.4(e), this Court has held that a prosecutor may, during closing argument, comment on conflicts and contradictions in testimony. *State v. Raugust*, 2000 MT 146, ¶ 43, 300 Mont. 54, ¶ 43, 3 P.3d 115, ¶ 43 (citing *State v. Gladue*, 1999 MT 1, ¶ 15, 293 Mont. 1, ¶ 15, 972 P.2d 827, ¶ 15). Finally, the State argues that even if the prosecutor's remark was improper, the District Court did not abuse its discretion in denying Ferguson's Motion for a Mistrial because he failed to show that he was prejudiced by the remark.

¶80 We review a district court's ruling on a motion for mistrial to determine whether the court abused its discretion. *State v. Duffy*, 2000 MT 186, ¶ 34, 300 Mont. 381, ¶ 34, 6 P.3d 453, ¶ 34 (citing *State v. Partin* (1997), 287 Mont. 12, 17, 951 P.2d 1002, 1005). To establish that the district court abused its discretion, the defendant must first show that the prosecutor engaged in misconduct. *Duffy*, ¶ 35. Prosecutorial misconduct is determined by

reference to established norms of professional conduct. *Duffy*, ¶ 35 (citing *Everroad v. Indiana* (1991), 571 N.E.2d 1240, 1244). Second, the defendant must show that the alleged prosecutorial misconduct violated his or her substantial rights. *Duffy*, ¶ 35 (citing *State v. Soraich,* 1999 MT 87, ¶ 20, 294 Mont. 175, ¶ 20, 979 P.2d 206, ¶ 20). We will not presume prejudice from charges of prosecutorial misconduct. *Duffy*, ¶ 35 (citing *Soraich, ¶* 20).

¶81    It is uncontested that Taylor's statements made in the February interview with Ewalt were substantially different from his trial testimony regarding the attempted robbery. Taylor admitted this, and the video recording of the February interview proved it. However, there was conflicting evidence as to what Taylor stated on the Thursday before trial. Taylor indicated that those statements were consistent with his trial testimony. But the prosecutor, in direct contradiction to Taylor's testimony, asserted before the jury that the statements given on the prior Thursday were "substantially different than what we heard today." In conjunction with this assertion, the prosecutor indicated that Ewalt could rebut Taylor's testimony regarding his statements made on the prior Thursday. However, no such rebuttal was ever presented. Rather, the State merely presented evidence proving what Taylor had already admitted--that his statements given in February were substantially different from his trial testimony. Thus, the prosecutor's remark was the only indication that Taylor had made inconsistent statements during the Thursday interview.

¶82    It is indeed a unique question we are faced with, and we find compelling factors on both sides of the issue. On one hand, it certainly appears at first glance that the prosecutor's remark was improper in that it was an outright contradiction of Taylor's testimony, it

essentially attacked Taylor's credibility, and it was rendered in front of the jury. Further, our concern with this remark is heightened by the fact that it was never supported with any evidence. On the other hand, the remark was made in response to a direct question from the District Court, and the prosecutor provided a concise answer without gratuitously emphasizing the inconsistency in Taylor's statements. Ultimately, however, we set these considerations aside, concluding that we need not determine whether the prosecutor's remark technically amounted to prosecutorial misconduct, because we determine that Ferguson has failed to demonstrate significant prejudice resulting from the remark.

¶83    When the prosecutor made his remark, Taylor had already dramatically discredited himself by asserting that his statements given in February were not truthful. The video recording of the February interview clearly showed the stark contrast between Taylor's prior statements and his trial testimony. Hence, we conclude that even if Ferguson could demonstrate that the jury accepted the prosecutor's questionable remark as conclusive proof that Taylor had also given inconsistent statements during the Thursday interview, he has failed to demonstrate any prejudice violating his substantial rights.

¶84    Furthermore, we must reject Ferguson's assertion that the prosecutor's remark was "the only evidence in the trial of any substance indicating that Ferguson knowingly participated in the attempted robbery." As explained hereafter in our discussion regarding Ferguson's Motion for a Directed Verdict of acquittal, there was other evidence indicating that Ferguson knowingly participated in the attempted robbery. Thus, we hold that the

District Court did not abuse its discretion in denying Ferguson's Motion for a Mistrial based on the prosecutor's remark.

¶85   **4. Did the District Court err in denying Ferguson's motions for a directed verdict of acquittal?**

¶86   At the close of the State's case-in-chief, Ferguson's counsel moved for a directed verdict of acquittal. In doing so, he argued that although Ferguson was present during the incident, the evidence indicated that he did not plan the robbery and was not aware that it was going to occur. In response, the State argued that the Wal-Mart surveillance video footage showed Ferguson, Taylor, and Vezina working in concert during the incident. The State also pointed to the evidence that Ferguson was "brought along as muscle." The District Court denied Ferguson's Motion.

¶87   At the conclusion of all testimony, Ferguson's counsel again moved for a directed verdict of acquittal, renewing his previous contentions and arguing that no witness had testified that Ferguson was involved in the attempted robbery. The State also renewed its previous contentions and the District Court again denied the Motion.

¶88   On appeal, Ferguson argues that the District Court "failed to properly evaluate the evidence and should have granted the directed verdict." In support of this argument, Ferguson notes that the Wal-Mart surveillance video footage was blurry and only showed Ferguson approach Janich's truck with Taylor and Vezina. Ferguson also notes that the testimony of Spaeny, Taylor, Vezina, and Heisler, corroborated his claim that he had no knowledge of the plan to rob Janich. In response, the State argues that the jury was entitled

to reject this testimony and conclude, based on the other evidence, that Ferguson had a direct role in planning and participating in the robbery attempt. Hence, the State argues that the District Court properly denied Ferguson's motions.

¶89 This Court reviews the denial of a motion for a directed verdict of acquittal to determine whether the district court abused its discretion. *State v. Ray*, 2003 MT 171, ¶ 34, 316 Mont. 354, ¶ 34, 71 P.3d 1247, ¶ 34 (citing *State v. Giant*, 2001 MT 245, ¶ 9, 307 Mont. 74, ¶ 9, 37 P.3d 49, ¶ 9). A directed verdict is appropriate when there is no evidence upon which a jury could base a guilty verdict. *Ray*, ¶ 34 (citing *Giant*, ¶ 9). No abuse of discretion occurs if, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Ray*, ¶ 34 (citing *Giant*, ¶ 9).

¶90 The State charged Ferguson with the offense of attempted robbery in violation of §§ 45-4-103 and 45-5-401, MCA. Section 45-4-103, MCA, provides that a person commits the offense of attempt when, with the purpose to commit a specific offense, he does any act toward the commission of such offense. Section 45-5-401(1)(b), MCA, provides, in pertinent part, that a person commits the offense of robbery if, in the course of committing a theft, the person threatens to inflict bodily injury upon any person, or purposely or knowingly puts any person in fear of immediate bodily injury. The jury instructions outlined these statutes.

¶91 At trial, the State presented many pieces of evidence which, when considered together, would allow a rational juror to find the essential elements of the charged offense

41

beyond a reasonable doubt. However, we need not render an exhaustive list of such evidence in support of our rationale regarding this issue. Hence, we merely set forth several pieces of evidence which, when viewed in a light most favorable to the prosecution, require that we affirm the District Court's denial of Ferguson's motions for a directed verdict.

¶92     Spaeny testified that while in Wal-Mart, Ferguson prompted her and Taylor to "look at the guy with the big wad of cash." Next, Spaeny testified, Ferguson and Taylor told her to set down the items they had planned to purchase, and they made an early exit to the parking lot. Thereafter, Spaeny testified, as the group sat in Vezina's vehicle, they had a discussion "[a]bout how much cash that guy had . . . and that they were going to go use his phone." Further, Spaeny testified that the group then maneuvered Vezina's car in the parking lot "[s]o they could watch [Janich]." It is undisputed that Ferguson approached Janich's truck with Taylor and Vezina, and was present during the attempted robbery. Taylor testified that he had planned to use Ferguson as "the muscle" in the incident. Janich testified that he thought they were acting as a group. Janich further testified that while only one individual pulled a knife, the other two "acted like they had knives." After they ran from Janich's truck, Spaeny testified that she thought "they had done something wrong and robbed the guy . . . ." She reached this conclusion based on the prior discussion regarding Janich's cash.

¶93     When considering Ferguson's second Motion for a Directed Verdict, even more evidence was available to the District Court. Vezina testified that he wanted Ferguson to be present for the robbery because "he's a big guy" and "[i]f something did go wrong, he--you

know, whether he knew [of the planned robbery] or not, he'd know what to do." Additionally, Ferguson admitted that he had seen Janich's roll of cash while waiting in the check-out line in Wal-Mart. Further, the jury and the court heard Taylor's prior inconsistent statement directly implicating Ferguson.

¶94 Ferguson relies heavily upon the assertion that Spaeny, Taylor, Vezina, and Heisler, all corroborated his claim that he had no knowledge of the planned robbery. However, the jury was not bound to accept this testimony to the exclusion of all other evidence. As we have held, a jury is at liberty to believe all, a part of, or none of the testimony of any witness. *State v. Kelley*, 2005 MT 200, ¶ 22, 328 Mont. 187, ¶ 22, 119 P.3d 67, ¶ 22 (citing *State v. Taylor* (1973), 163 Mont. 106, 116, 515 P.2d 695, 701).

¶95 After viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. Thus, we hold that the District Court did not abuse its discretion in denying Ferguson's motions for a directed verdict of acquittal.

¶96 **5. Did the District Court err in sentencing Ferguson?**

¶97 Ferguson contends that three sentencing errors occurred here. First, Ferguson argues that the District Court erred when it sentenced him on the basis of "misinformation." The pre-sentence investigation report (PSI), Ferguson claims, contained numerous factual errors which affected the District Court's sentencing decision. In support of this contention, he asserts the PSI erroneously "said Ferguson was convicted on numerous prior felonies." In fact, Ferguson claims, he was only convicted of one felony, when he was thirteen years old.

43

Additionally , Ferguson notes that: (1) the District Court failed to resolve the factual disputes regarding the PSI which Ferguson raised at the sentencing hearing; (2) the written judgment lists "defendant's juvenile criminal history/record" as a reason for the sentence imposed; and (3) the District Court characterized Ferguson as a "one-man crime wave" and sentenced him to a lengthy prison term. He concludes, "[t]his demonstrates that Ferguson was sentenced on the basis of misinformation, a clear violation of his rights to due process under the United States and Montana Constitutions."

¶98 In response, the State argues "it was appropriate for the district court to conclude that Ferguson was not deserving of a deferred sentence, as his counsel requested." We find this argument irrelevant and unresponsive to Ferguson's contention that he was sentenced upon erroneous information. However, the State also argues that the record simply does not support Ferguson's contentions. We agree.

¶99 As Ferguson notes, "[t]he due process clauses of the Fourteenth Amendment to the United States Constitution and Article II, Section 17 of the Montana Constitution protect a defendant from being sentenced based upon misinformation." *State v. Mason*, 2003 MT 371, ¶ 21, 319 Mont. 117, ¶ 21, 82 P.3d 903, ¶ 21 (citing *Bauer v. State*, 1999 MT 185, ¶ 20, 295 Mont. 306, ¶ 20, 983 P.2d 955, ¶ 20). Whether a district court's sentence violated a defendant's constitutional rights is a question of law which we review *de novo*. *Mason*, ¶ 19 (citing *State v. Bedwell*, 1999 MT 206, ¶ 4, 295 Mont. 476, ¶ 4, 985 P.2d 150, ¶ 4).

¶100 Due process requires that an offender be given an opportunity to explain, argue, and rebut any information, including pre-sentencing information, that may lead to a deprivation

44

of life, liberty, or property. *Mason*, ¶ 21 (citing *State v. Allen*, 2001 MT 266, ¶ 18, 307 Mont. 253, ¶ 18, 37 P.3d 655, ¶ 18). However, "due process does not protect against all misinformation--rather, the inquiry turns on whether the sentence was premised on materially false information." *Mason*, ¶ 21 (citing *Bauer*, ¶ 22). When a criminal defendant contests matters in a pre-sentence report, the defendant has an affirmative duty to present evidence establishing inaccuracies. *Mason*, ¶ 21 (citing *State v. Winkle*, 2002 MT 312, ¶ 19, 313 Mont. 111, ¶ 19, 60 P.3d 465, ¶ 19; *Bauer*, ¶ 22).

¶101 Here, the District Court provided ample opportunity for both Ferguson and his counsel to explain and rebut the information contained in the PSI. Ferguson's counsel addressed numerous issues. The PSI indicates that Ferguson was arrested for a curfew violation; counsel asserted that Ferguson claimed he was never arrested for this offense. The PSI indicates that Ferguson was ticketed for purchasing or possessing an intoxicating substance; counsel asserted that Ferguson was never charged with the offense. The PSI indicates that Ferguson was arrested for possession of burglary tools and curfew violation; counsel asserted that Ferguson was never charged with these offenses. The PSI indicates that Ferguson was ticketed for "Improper Bike Equipment"; counsel asserted that the charge was dismissed. The PSI indicates that Ferguson was "Referred to Juvenile Parole" for two misdemeanor theft offenses; counsel asserted that Ferguson was not charged with these offenses. The PSI indicates that Ferguson was returned to Pine Hills Youth Correctional Facility pursuant to the offenses of theft and unauthorized use of a motor vehicle; counsel asserted that Ferguson was never charged with these offenses. The PSI indicates that

45

Ferguson "was involved in a case of cruelty to animals" but was not charged; counsel asserted that Ferguson had actually reported an instance of animal cruelty to the authorities. The PSI states that the Police Department possesses a videotape which shows Ferguson smoking marijuana; counsel asserted that Ferguson was actually smoking tobacco. The PSI states that Ferguson questioned an individual about the theft of Ferguson's marijuana; counsel asserted that Ferguson denied the accusation.

¶102 Additionally, Ferguson's counsel addressed the PSI's references to felony offenses. The PSI states that Ferguson was involved in the felony theft of a .40 caliber Glock handgun and a police radio; counsel asserted that Ferguson was never charged with these offenses. The PSI indicates that Ferguson was returned to Pine Hills Youth Correctional Facility on parole violations pursuant to the offenses of felony theft, felony kidnaping, burglary, and criminal possession of dangerous drugs; counsel asserted that Ferguson was never charged with these offenses. In addressing these portions of the PSI, counsel repeatedly stressed that Ferguson was only convicted of one felony offense--a burglary which he committed when he was thirteen years old. The PSI also indicates that Ferguson was charged with felony theft, but the charge was amended to a misdemeanor and Ferguson was ordered to pay $1,959.98 in restitution. Counsel conceded the accuracy of this portion of the PSI and noted that Ferguson had paid half of the ordered restitution.

¶103 The PSI states that Ferguson has had "several adjudications" for felony offenses such as burglary, theft, and kidnaping; counsel asserted that this was simply not true, but provided no further explanation. The transcript of the sentencing hearing indicates that Ferguson's

46

adjudications were a part of his probation revocation proceedings. Ferguson personally explained that when he had admitted to probation violations, he did so upon advice from his probation officer that he "didn't necessarily have to take full responsibility for the offenses." He stated "I was acknowledging that I was accepting limited responsibility for my involvement in those alleged offenses, and I never completely admitted to each and every one of the offenses."

¶104 Ferguson cites no authority for his suggestion that the District Court's failure to "resolve" the contested factual issues supports a reversal here. We note that most of counsel's assertions did not challenge the accuracy of the PSI, but merely provided additional clarifying information. However, even assuming that the PSI could fairly be characterized as materially inaccurate, and even assuming that the explanations and denials given at the hearing were sufficient to satisfy the "affirmative duty to present evidence establishing inaccuracies," *Mason*, ¶ 21, we conclude that Ferguson has failed to demonstrate that the District Court sentenced him based on any misinformation, let alone any material misinformation.

¶105 Ferguson asserts that the "corrections" he and his counsel advocated at the hearing "went unrefuted." Indeed, the record indicates that the District Court accepted the proffered "corrections." The written judgment explains that the District Court's sentencing decision was based on, *inter alia*: (1) consideration of the PSI and "the corrections/modifications" made at the sentencing hearing; and (2) consideration of "defendant's juvenile criminal history/record noting *one* prior felony." (Emphasis added.) Moreover, during the hearing

47

the District Court explicitly acknowledged the lack of convictions on Ferguson's record beyond the "one felony." Even the State acknowledged the lack of convictions on Ferguson's record when discussing his probation violations.

¶106 Finally, the District Court's characterization of Ferguson as a "one-man crime wave" does not demonstrate that the sentence rendered herein was based on misinformation. We take this merely as evidence that the District Court was cognizant of Ferguson's demonstrable tendencies. In addition to this and other comments regarding Ferguson's criminal history, the District Court demonstrated a keen focus on the circumstances surrounding Ferguson's conviction, noting "I don't hear you taking responsibility for your actions *in this case*." (Emphasis added.)

¶107 We conclude Ferguson has failed to demonstrate that the District Court sentenced him on the basis of misinformation. Thus, we must reject Ferguson's claim that the sentence violated his due process rights.

¶108 Second, Ferguson argues, with very little supporting analysis, that his right to due process was violated during sentencing when the State introduced evidence of uncharged crimes and probation violation reports. Specifically, Ferguson challenges the admission of his own prior statements, through Ewalt's testimony, which "concerned a theft, an unauthorized use of a motor vehicle, and a couple of other crimes." Ferguson asserts that none of these offenses were ever charged. Ferguson also argues that the admission of such evidence was unfair because he was not notified that it would be offered and, hence, he could not properly prepare for the hearing. Further, Ferguson argues that the State failed to

lay proper foundation for the admission of probation violation reports under Rule 901, M.R.Evid., and the District Court improperly took judicial notice of these items pursuant to Rule 201(b), M.R.Evid. Ferguson concludes "[t]he consideration of these additional uncharged crimes and the introduction of probation and parole reports without adequate foundation are a clear violation of Ferguson's due process rights."

¶109   We have held that the rules of evidence are not applicable or controlling in sentencing hearings, as a sentencing court is allowed to have the fullest information possible concerning the defendant's life and characteristics in order to individualize punishment. *State v. J.C.*, 2004 MT 75, ¶ 31, 320 Mont. 411, ¶ 31, 87 P.3d 501, ¶ 31 (quoting *State v. Race* (1997), 285 Mont. 177, 180, 946 P.2d 641, 643). Moreover, in imposing a sentence, the sentencing court may consider any relevant evidence relating to the nature and circumstances of the crime, the character of the defendant, the defendant's background and history, the defendant's mental and physical condition, and any evidence the court considers to have probative force. *Mason*, ¶ 23 (citing *State v. Collier* (1996), 277 Mont. 46, 63, 919 P.2d 376, 387). We have held this includes evidence of other acts, even those resulting in acquittal or which are dismissed pursuant to a plea bargain agreement. *Mason*, ¶ 23 (citing *State v. Baldwin* (1981), 192 Mont. 521, 524, 629 P.2d 222, 224). Pursuant to these precedents, we must conclude that Ferguson has failed to demonstrate a due process violation.

¶110   Third, Ferguson argues that the District Court erred by sentencing him upon the assumption that his offense was a "crime of violence." Pursuant to this argument, we review Ferguson's sentence for legality. *State v. Herd*, 2004 MT 85, ¶¶ 11, 22, 320 Mont. 490,

¶¶ 11, 22, 87 P.3d 1017, ¶¶ 11, 22 (citing *State v. Montoya*, 1999 MT 180, ¶ 15, 295 Mont. 288, ¶ 15, 983 P.2d 937, ¶ 15).

¶111   Section 46-18-104(2)(a)(i), MCA, defines a "crime of violence" as "a crime in which an offender uses or possesses and threatens to use a deadly weapon during the commission or attempted commission of a crime." At Ferguson's sentencing hearing, the District Court stated:

> There was a knife used in this offense. There was no testimony directly that you had the knife, but Tyson Heisler [sic] said, he testified at trial that he wanted you there. You were the big guy, you would help out if things went wrong. And I believe that the first statement that Tim Taylor gave, and he testified in trial, in his first statement that he said that you did have a knife. . . .
> . . . .
> Now, there's no way that I'm going to give you a deferred sentence. Even though you are a young man, even though this offense was committed when you were 17, this was a violent offense with a knife that you were a part of.

In accordance with these statements, the District Court's written judgment designated Ferguson's crime as a violent offense and listed this designation as one of the reasons for the sentence imposed.

¶112   While Taylor stated that Ferguson "pulled a knife" during the incident, the jury did not necessarily have to believe that statement in order to convict Ferguson of attempted robbery, because the use of a weapon is not requisite for the commission of that offense. *See* §§ 45-4-103 and 45-5-401(1)(b), MCA. On the other hand, in order for the sentencing judge to conclude that a "crime of violence" was committed, he would have to find that Ferguson "use[d] or possesse[d] and threaten[ed] to use a deadly weapon during the commission or

50

attempted commission of a crime." Section 46-18-104(2)(a)(i), MCA. Here, the District Court did not make that requisite finding, but merely determined that Ferguson was a "part of" an offense wherein a knife was used. This determination--the mere finding that *someone* in the group used a knife during the incident--does not rise to the level of a finding that Ferguson used the knife. Thus, we conclude the District Court erred in sentencing Ferguson as if his offense was a "crime of violence." Accordingly, we reverse and remand for sentencing consistent with § 46-18-225, MCA, which provides for the sentencing of non-violent felony offenders.

¶113 **6. Did the District Court err in not granting Ferguson's Motion to Dismiss for failure to enter a written judgment on the record within the time period established at § 46-18-116(1), MCA?**

¶114 On March 3, 2004, Ferguson filed his Motion for a New Trial and Alternative Motion for Expedited Sentencing, together with a supporting brief. This document contained the following paragraph:

> Ferguson moves the Court to set a date for sentencing and requests that the date for sentencing be expedited. Nearly a month has already gone by without a sentencing date being set. Ferguson has been in the custody of the Montana Department of Corrections for most of the past several years. Therefore, the information upon which to base a sentence is readily available. Finally, he intends to appeal his conviction in this case, but he cannot do that until he is sentenced. Even a successful appeal will not cure the incarceration that he now is experiencing.

Just over two weeks later, on March 18, the State filed a response in opposition to Ferguson's Motion for a New Trial. The State did not oppose Ferguson's Motion for Expedited Sentencing.

51

¶115   On March 30, the District Court filed an Order denying Ferguson's Motion for a New Trial and setting Ferguson's sentencing hearing for the next day.  Thus, on the last day of March, the District Court held the sentencing hearing and orally sentenced Ferguson to a term of fifteen years at the Montana State Prison with credit for time served.  As this sentence was rendered pursuant to the Criminally Convicted Youth Act, the District Court:  (1) provided that it would retain jurisdiction over the case until Ferguson's twenty-first birthday; (2) provided for sentence review shortly before Ferguson's twenty-first birthday; and (3) ordered the Department of Corrections to submit a status report on Ferguson every six months until his twenty-first birthday.  *See* § 41-5-2503, MCA.

¶116   Just over a month later, on May 3, Ferguson filed his Motion to Dismiss and Alternative Motion for Appeal Bond, together with a supporting brief.   The Motion to Dismiss was based on § 46-18-116(1), MCA, which provides, *inter alia*, that district courts must enter a written judgment on the record within thirty days after the oral pronouncement of the disposition of the case.  In the Motion, Ferguson observed that no written judgment had yet been filed and argued that the District Court had lost jurisdiction to impose a sentence because of its failure to adhere to the time limitation of § 46-18-116(1), MCA.  Neither the State nor the District Court responded to this Motion.  Finally, on May 18--forty-eight days after Ferguson's oral sentence was rendered, and eighteen days after the statutory deadline--the District Court entered its written judgment on the record.

¶117   A district court's ruling on a motion to dismiss in a criminal proceeding is a question of law which we review *de novo*.  *State v. White Bear*, 2005 MT 7, ¶ 5, 325 Mont. 337, ¶ 5,

52

106 P.3d 516, ¶ 5 (citing *State v. Goebel*, 2001 MT 73, ¶ 10, 305 Mont. 53, ¶ 10, 31 P.3d 335, ¶ 10).

¶118   On appeal, Ferguson contends that when the District Court failed to conform to the time limitation of § 46-18-116(1), MCA, it lost jurisdiction to impose a judgment, and thus should have dismissed the case.  Ferguson concedes that our precedent does not directly address the violation at issue here, but also argues that we addressed a similar situation in *State v. Winterrowd*, 1998 MT 74, 288 Mont. 208, 957 P.2d 522.  There, the defendant, Winterrowd, was convicted of burglary and theft.  *Winterrowd*, ¶ 7.  The district court sentenced him to ten years in the Montana State Prison pursuant to the burglary conviction, but failed to sentence him pursuant to the theft conviction, either in open court or by written judgment.  *Winterrowd*, ¶¶ 7, 13.  Four months later, the district court issued an Order *nunc pro tunc* sentencing Winterrowd to six months imprisonment on the theft conviction, to run concurrently with his sentence on the burglary conviction.  *Winterrowd*, ¶ 13.  On appeal, this Court held that it was an abuse of discretion for the district court to attempt to correct, by *nunc pro tunc* order, its failure to sentence Winterrowd on the theft conviction.  *Winterrowd*, ¶ 17.  Thus, we reversed and vacated the sentence.  *Winterrowd*, ¶ 18.

¶119   Ferguson argues that because the written judgment here violated the explicit statutory mandate, we should vacate the sentence just as we did in *Winterrowd*.  The State contends that *Winterrowd* does not support Ferguson's argument.  We agree.  The holding in *Winterrowd* is limited to *nunc pro tunc* orders and we see no reason to extend it in a way that would allow convicted individuals to escape sentencing altogether.

53

¶120   Ferguson also claims support for his argument in *State v. Goebel*, 2001 MT 155, 306 Mont. 83, 31 P.3d 340, and *State v. Finley*, 2003 MT 239, 317 Mont. 268, 77 P.3d 193, which he describes as "cases where probation revocation proceedings were vacated after this Court concluded that the District Court's failure to follow prescribed procedures deprived it of jurisdiction." We agree with the State's contention that nothing in these cases provides a basis for the outright dismissal of Ferguson's case.

¶121   We conclude Ferguson has failed to demonstrate that his case should have been dismissed based on the District Court's violation of § 46-18-116(1), MCA. We do not believe the Legislature intended that such an extreme remedy should follow such a relatively minor infraction by a district court. This conclusion finds support in Montana's correctional and sentencing policy of holding offenders accountable and punishing them commensurate with the nature and degree of harm caused by the offense. Section 46-18-101(2)(a), MCA.

¶122   However, we do not view the time limitation of § 46-18-116(1), MCA, as a mere technicality which may be observed at leisure. As § 46-18-101(3)(a), MCA, provides, timeliness and consistency are two sentencing principles which the Legislature adopted in order to achieve Montana's correctional and sentencing policy. Hence, we are compelled to express our concern with the District Court's tardiness in rendering Ferguson's written judgment more than two weeks past the unambiguous deadline contained in § 46-18-116(1), MCA. The record before us does not disclose a legitimate justification for this plain violation of the rule. Admittedly, however, we do not know whether some extraordinary circumstance kept the District Court from fulfilling its statutory duty. Yet, the court's failure

54

is remarkable in light of the fact that Ferguson requested *expedited* sentencing nearly a month after his trial when no sentencing date had been established.

¶123   In conclusion, we observe that because the time limitation of § 46-18-116(1), MCA, is not complimented by a provision for remedial measures in cases such as this, district courts are left to exercise their discretion in rendering timely written judgments on the record.

¶124   **7. Did the proceedings contain cumulative error sufficient to warrant a new trial?**

¶125   Ferguson argues that the cumulative effect of the individual errors he has identified warrants reversal, even if no single error does.  In support of this argument, Ferguson merely reiterates his primary contentions under each of the issues we have discussed above.

¶126   The doctrine of cumulative error requires reversal of a conviction where a number of errors, taken together, prejudiced a defendant's right to a fair trial.  *State v. Larson*, 2004 MT 345, ¶ 65, 324 Mont. 310, ¶ 65, 103 P.3d 524, ¶ 65 (citing *State v. Ottwell* (1989), 239 Mont. 150, 157, 779 P.2d 500, 504).  The existence of prejudice must be established by the defendant, as mere allegations of error without proof of prejudice are inadequate to satisfy the doctrine.  *Larson*, ¶ 65 (citing *State v. Campbell* (1990), 241 Mont. 323, 329, 787 P.2d 329, 333).

¶127   We have found error only in Ferguson's sentence, and that error will be remedied upon remand.  Accordingly, we find no grounds to apply the doctrine of cumulative error in this case.

## CONCLUSION

55

¶128   We affirm in part, reverse in part, and remand for sentencing in accordance with § 46-18-225, MCA.

/S/ JAMES C. NELSON

We Concur:

/S/ JIM RICE
/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART